UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| JACOB A. FRUIT, | ) | |
| | ) | |
| Petitioner[1], | ) | Case No. 08 C 50049 |
| | ) | (07 CR 50001-01) |
| v. | ) | |
| | ) | Judge James B. Zagel |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, submits the following response

to petitioner's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. §

2255:

**I. PROCEDURAL HISTORY**

On January 30, 2007, an indictment was returned charging petitioner Jacob A. Fruit

and Phillip G. Wright with one count of bank robbery, in violation of 18 U.S.C. §§ 2113(a).

R.11.[2] On March 19, 2007, co-defendant Wright pled guilty to the charge contained in the

---

[1]     In his § 2255 petition, Jacob A. Fruit incorrectly identified himself as the
"defendant" and the United States as the "plaintiff." The United States respectfully requests that
this court order that the caption be changed to correctly reflect Fruit's status as the petitioner and
the United States' status as the respondent.

[2]     The case number of petitioner Fruit's criminal case is 07 CR 50001-01. All
citations to documents contained in the record of that case are denoted "R." and followed by the
applicable document number.

indictment.  R.18, 19.  As part of his plea agreement, Wright agreed to cooperate with the United States in its prosecution of petitioner.  *Id.*

Petitioner subsequently pled guilty on September 5, 2007.  R.29, 30.  In his signed, written plea agreement, petitioner admitted that he had participated with Wright in the robbery of State Bank of Paw Paw, in Paw Paw, Illinois, on January 2, 2007.  R.30 at 2-4. Specifically, petitioner admitted that he planned the robbery with Wright on the morning of January 2, 2007.  *Id.* at 2.  Petitioner further admitted that he gave Wright instructions on how to commit the robbery.  *Id.*  Regarding the commission of the robbery, petitioner acknowledged that he stood outside the bank as a lookout, while Wright went inside the bank and demanded money from the tellers.  *Id.* at 3.  After the robbery, defendant and Wright fled the bank in Wright's vehicle and led deputies from Lee and DeKalb Counties on a high-speed chase.  *Id.* at 4.  After Wright stopped the vehicle at a farm outside of Sycamore, Illinois, both petitioner and Wright got out of the vehicle and fled on foot.  *Id.*  Petitioner further admitted that during this foot chase, he turned and pointed a BB gun at one of the deputies. *Id.*  The deputy fired his service weapon, striking petitioner in the ear.  *Id.*  The deputies then took petitioner and Wright into custody.  *Id.*

In return for the concessions made by the United States in the plea agreement, petitioner waived his right to appeal his sentence.  *Id.* at 13-14.  *See also* P.Tr. 12.[3]  Petitioner

---

[3]     A copy of the transcript of the plea hearing is attached to this response as "Exhibit A."  All references to this transcript are denoted "P.Tr." and followed by the applicable page number.

also agreed to waive his right to file a motion pursuant to 28 U.S.C. § 2255, except to the extent that such claim was based upon involuntariness or ineffective assistance of counsel relating to the negotiation of that waiver.  *Id.*

Petitioner's sentencing hearing was conducted on December 5, 2007.  R.37, 38.  This court first granted defense counsel's objection to the Pre-Sentence Investigation Report ("PSR"), finding that the State Bank of Paw Paw did not qualify as a "vulnerable victim" for purposes of Guideline 3A1.1.  S.Tr. 3-6.[4]  The court then sentenced petitioner to 78 months of imprisonment.  R.38.  The 78 month sentence was at the upper end of the applicable Sentencing Guidelines range.  S.Tr. 6.

Petitioner filed the present § 2255 petition on March 24, 2008.  On April 21, 2008, this court issued an order directing the United States to respond by May 19, 2008.

### III.  DISCUSSION

A.     <u>Petitioner's Pre-Plea Hearing Claims</u>

Petitioner alleges that numerous actions (and failures to take action) by his defense counsel constitute ineffective assistance of counsel.  Several of petitioner's complaints relate to events that occurred prior to his plea hearing.  Petitioner, however, waived all of these claims when he entered his voluntary guilty plea on September 5, 2007.

---

[4]     A copy of the transcript of the sentencing hearing is attached to this response as "Exhibit B."  All references to this transcript are denoted "S.Tr." and followed by the applicable page number.

"[A] knowing and voluntary guilty plea bars the defendant from subsequently challenging alleged constitutional deprivations that occurred prior to the plea." *United States v. Seybold,* 979 F.2d 582, 585 (7th Cir. 1992).  The *Seybold* court went on to quote the following language from the Supreme Court's decision in *Tollett v. Henderson,* 411 U.S. 258, 267 (1973):

> "[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McCann.* [397 U.S. 759 (1970)].

The Seventh Circuit also stated: "'The only rational manner in which a judge may determine whether a plea is knowingly and voluntarily made, is to observe the defendant's demeanor and responses to the court's questions and to rely on the defendant's sworn answers.'" *Seybold,* 979 F.2d at 587 (*quoting United States v. Ellison,* 835 F.2d 687, 693 (7th Cir. 1987)).  "The record of a Rule 11 proceeding is 'entitled to a presumption of verity.'" *Seybold,* 979 F.2d at 587 (*quoting Key v. United States,* 806 F.2d 133, 136 (7th Cir. 1986)).

In the present case, petitioner entered a knowing and voluntary plea of guilty.  After addressing the defendant on the record, this court first found that defendant was competent to offer a guilty plea.  P.Tr. 4.  A short time later, petitioner told the court that he was satisfied with his attorney's efforts and that he had discussed with his attorney the charge and

4

everything he knew about the case.  P.Tr. 5.  The court then carefully explained petitioner's

trial rights to him, and petitioner indicated that he understood those rights.  P.Tr. 6-9.  In

response to the court's questions, petitioner stated that he had read the plea agreement and

discussed it with his attorney.  P.Tr.9-10.  Petitioner also indicated that he understood that

the court could sentence him to any sentence up to the maximum of 240 months of

imprisonment.  P.Tr. 11, 13.  Petitioner also stated that he understood that he was giving up

his right to appeal the sentence.  P.Tr. 12.  Petitioner then affirmed that no one was forcing

him to plead guilty, and that one had threatened him in any way to cause him to plead guilty.

P.Tr. 12.  Defendant also affirmed that his decision to plead guilty was entirely voluntary.

P.Tr. 13.

The court's colloquy with the petitioner at the plea hearing establishes that petitioner

entered his guilty plea knowingly and voluntarily.  Thus, unless petitioner can establish that

the advice he receive from counsel prior to the plea hearing constituted ineffective assistance

of counsel, petitioner has waived all of his claims relating to events that preceded his plea

hearing.  As discussed in the following subsections, however, the alleged pre-plea hearing

errors cited by petitioner in his § 2255 motion do not constitute ineffective assistance.  As

a result, petitioner's claims must be denied.

1.    *Miranda* Claim

Petitioner first claims that his constitutional rights were violated when he was

questioned by the FBI during the evening of his arrest.  Specifically, defendant claims that

5

he requested that an attorney be present during the questioning, but that his request was denied. During the pre-trial proceeding's, petitioner's counsel did not file a motion to suppress. Presumably, petitioner is claiming that his counsel's failure to file a motion to suppress constitutes ineffective assistance.

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that a reasonable probability exists that, but for his attorney's unprofessional representation, the result of the proceeding would have been different. *Ebbole v. United States,* 8 F.3d 530, 533 (*citing Strickland v. Washington,* 466 U.S. 668, 687-88 (1984)). In the context of a guilty plea, the defendant must show that but for counsel's deficient advice, he would have insisted on proceeding to trial. *Bethel v. United States,* 458 F.3d 711, 715 (7th Cir. 2006). In determining the adequacy of an attorney's performance, a reviewing court must employ "a highly deferential presumption in favor of the reasonable exercise of professional judgment." *United States v. Hodges,* 259 F.3d 655, 658 (7th Cir. 2001).

"When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, . . . a defendant [must] prove the motion was meritorious." *United States v. Cieslowski,* 410 F.3d 353, 360 (7th Cir. 2005)(*citing Owens v. United States,* 387 F.3d 607, 610 (7th Cir. 2004) *and United States v. Stewart,* 388 F.3d 1079, 1084 (7th Cir. 2004)). Further, "[a]n ineffective assistance of counsel claim cannot stand on a blank record,

peppered with the defendant's own unsupported allegations of misconduct." *Hodges,* 259 F.3d 660.

In the present case, petitioner has not proved that a motion to suppress his statements to the FBI would have been meritorious. Petitioner has offered no evidence in support of this point. Instead, petitioner has offered only his self-serving, unsupported allegation that he requested counsel during the interview. This allegation is belied by documents that were provided to defense counsel during discovery.

Immediately before he was interviewed on January 2, 2007, petitioner signed an "Advice of Rights" form.[5] This form expressly advised defendant of his rights, including his right to have a lawyer present during questioning and his right to a court-appointed lawyer if he could not afford to hire one on his own. The form also contains a "Waiver of Rights" section which states: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Defendant's signature appears immediately below this waiver.

Given the fact that his client signed a form which states "I am willing to answer questions without a lawyer present," defense counsel's decision not to file a motion to suppress was a rational, strategic decision. If the petitioner had testified at the suppression hearing that he had requested counsel, and if the court ruled against him, petitioner would have been exposed to an additional two-level enhancement for obstruction of justice,

---

[5]     This form was provided to defense counsel at page 000019 of the government's discovery materials. A copy of this form is attached to this response as "Exhibit C."

7

pursuant to Guideline 3C1.1, and would have likely forfeited his opportunity to receive a three-level reduction for acceptance of responsibility, pursuant to Guideline 3E1.1. *See* USSG § 3C1.1, application notes 4(b) & (f); USSG § 3E1.1, application note 4. This potential five level swing would have exposed defendant to a Sentencing Guidelines range of 108 to 135 months of imprisonment. Based upon this record, defendant has not proved that his motion to suppress would have been successful, nor has he proved that his counsel was ineffective for failing to file the motion. *See Cieslowski,* 410 F.3d at 361 (holding that defense counsel was not ineffective for failing to file a motion to suppress, where she was concerned that the motion would expose her client to an obstruction of justice enhancement and a loss of the acceptance of responsibility reduction).

2.     Number of Visits with Defense Counsel

Petitioner's second and third allegations of ineffective assistance are: "During the course of his pre-trial Fruit seen his attorney present at two status hearings only" and "Fruit's inability to review the agreement in which he plead (sic) guilty to with proper counsel is a direct violation of his constitutional rights." Petitioner's claims are contradicted by the record, which demonstrates that petitioner had sufficient time to consult with his attorney prior to the plea hearing. In addition, petitioner has not proved any prejudice resulted from his alleged inability to meet with his attorney.

At the plea hearing, this court engaged in the following colloquy with petitioner:

| | |
|---|---|
| THE COURT: | Have you had enough time to talk to Mr. Flynn[6]? |
| THE DEFENDANT: | Yes. |
| THE COURT: | Have you told Mr. Flynn everything you know about the case? |
| THE DEFENDANT: | Yes. |
| THE COURT: | Are you satisfied with the advice and efforts on your behalf that were made by Mr. Flynn? |
| THE DEFENDANT: | Yes. |

P.Tr. 5.  At no time during the plea hearing did petitioner state that he had not had enough time to consult with his attorney.

"Defendants cannot obtain relief by the expedient of contradicting statements freely made under oath, unless there is a compelling reason for the disparity."  *Nunez v. United States,* 495 F.3d 544, 546 (7th Cir. 2007).  "District courts do not and need not treat lightly responses given under oath at a hearing conducted pursuant to Rule 11."  *United States v. Winston,* 34 F.3d 574, 578 (7th Cir. 1994).  "[T]he record of a Rule 11 proceeding is entitled to a 'presumption of verity,' and [the] answers contained therein are binding."  *Id.* (*citing United States v. Seybold,* 979 F.2d 582, 587 (7th Cir. 1992)).

---

[6]      The affidavit of Mr. Haneef Omar is attached as "Exhibit D."  As explained by Mr. Omar, petitioner's case was initially handled by Paul Flynn of the Federal Defender Program.  After petitioner's plea hearing, Mr. Flynn transferred from the Rockford office to the Chicago office of the Federal Defender Program.  After Mr. Flynn transferred, petitioner's case was reassigned to Mr. Omar.

In the present case, when he was placed under oath at the plea hearing, petitioner affirmed that he had had enough time to consult with his attorney about the case. Petitioner further affirmed that he was satisfied with his attorney's efforts on his behalf. Petitioner has offered no evidence suggesting why his prior statements were incorrect and should be disregarded. Because petitioner's claim that he had inadequate time to consult with his attorney is contradicted by his own statements under oath, this claim must be rejected.

Furthermore, even if petitioner did only meet with his attorney twice prior to the plea hearing, this fact alone is insufficient to sustain an ineffective assistance claim. The Seventh Circuit has stated: "'"We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel."'" *United States v. Mealy,* 851 F.2d 890, 908 (7th Cir. 1988)(*quoting United States v. Olson,* 846 F.2d 1103, 1108 (7th Cir. 1988) *and United States ex rel. Kleba v. McGinnis,* 796 F.2d 947, 954 (7th Cir. 1986)).

In *United States v. Goudy,* 792 F.2d 664, 672 (7th Cir. 1986), the defendant alleged that his attorney was ineffective, because he failed to meet with defendant during the three months preceding trial. The Seventh Circuit rejected Goudy's claim, noting that he had not contradicted his attorney's claim that there was no need for such a meeting. *Id.* In addition, the court of appeals stated: "Nor does Goudy suggest in any way how the outcome of the trial would have differed . . . if his attorney had met with him some unspecified number of times before trial." *Id. See also Mealy,* 851 F.2d at 908 (stating "Spotts fails to explain how the lack of consultation affected the outcome of the trial.")

10

In the present case, petitioner does not allege how the outcome his case would have been different if he had met with his attorney more often.[7]  Specifically, petitioner does not indicate how or why additional meetings with his attorney would have altered his decision to plead guilty.  As a result, petitioner has not established that his attorney's failure to meet with him on more occasions constitutes ineffective assistance of counsel.

>        3.        Inability to Review Discovery

Petitioner's fourth allegation is that he was never permitted to review "Part 1" of the discovery package.  Once again, however, petitioner's bare allegation fails to establish that his counsel was ineffective.

In *United States v. Seybold,* 979 F.2d 582, 586-87 (7th Cir. 1992), the defendant argued that his plea was involuntary, because "his inability to review all the discovery materials left him, on the eve of trial, 'without knowledge of how strong the government's case against him would be.'"  The Seventh Circuit rejected this argument, stating: "*Boykin* [*Boykin v. Alabama,* 395 U.S. 238 (1969)] and its progeny do not require the defendant to know the full extent of the government's case against him before pleading guilty.  Instead, 'knowledge,' as used in this context refers to 'a full understanding of the charges against [the

---

[7]        Petitioner alleges that in reviewing the plea agreement with him, Assistant Federal Defender Haneef Omar told petitioner that he was unfamiliar with the facts of the case.  In his affidavit, Mr. Omar denies making this comment.  Even if it is assumed that petitioner's allegation is true, petitioner has not demonstrated how Mr. Omar's comment affected the outcome of his case.  If true, petitioner was aware of Mr. Omar's comment prior to plea hearing.  In addition, despite this comment by Mr. Omar, defendant still informed the court that he was satisfied with his attorney's efforts and went forward with his guilty plea.

11

defendant] and the possible consequences of his plea.'" *Seybold,* 979 F.2d at 587 (*quoting Brady v. United States,* 397 U.S. 742, 749, n.6 (1970)).

Petitioner has cited no authority which requires a defense attorney to allow his client to read every single page of the government's discovery. Furthermore, as petitioner affirmatively acknowledged at his plea hearing, he had had enough time to speak with his attorney and he had told his attorney everything he knew about the case. P.Tr. 5. Given this acknowledgment, petitioner cannot establish that his counsel's performance in reviewing the government's evidence with him fell below an objective standard of reasonableness.

Furthermore, petitioner has not explained how having access to additional discovery materials would have changed his decision to plead guilty. As petitioner admitted under oath at his plea hearing, he participated in the January 5, 2007, robbery of State Bank of Paw Paw by: (1) helping to plan the robbery; and (2) by serving as a look-out while the robbery occurred. P.Tr. 13-16. In addition, petitioner was caught "red handed" immediately after the robbery. Specifically, he was observed running from the get-away vehicle and pointing a weapon at the pursuing sheriff's deputies. P.Tr. 15-16. Petitioner has not explained how any information contained in the government's discovery materials could have possibly negated this overwhelming evidence.

### 4.     Credibility of Co-Defendant

Petitioner's final claim relating to his attorney's pre-plea hearing performance relates to the credibility of cooperating co-defendant Phillip Wright. Petitioner states: "The co-defendant openly admitted to lying on his original proffer which clearly shows a lack of

12

credibility. This was never brought to the courts attention due to ineffectiveness of counsel."
Once again, defendant's allegation fails to establish ineffective assistance.

The incident to which petitioner refers is as follows: Immediately after he was
arrested on January 5, 2007, co-defendant Wright confessed. He also implicated petitioner
in the robbery. On January 24, 2007, Wright provided a proffer to the United States. During
this proffer, Wright maintained that he first discussed the robbery with petitioner while they
were driving from Rockford to Paw Paw on January 5, 2007. During a follow-up proffer on
January 31, 2007, Wright admitted that he actually first began speaking with petitioner about
the robbery on the preceding day. Wright explained that he had previously lied about this
point because he was concerned that his sentence would be increased if the crime was "pre-
meditated." On March 15, 2007, the United States disclosed Wright's two proffers to the
defense as part of a supplemental discovery package.[8]

As petitioner acknowledges in his motion, his attorney provided him with "Part 2" of
the government's discovery package. Thus, at the time he pled guilty, petitioner was aware
of Wright's lie at the first proffer. Despite this knowledge, defendant still went forward with
his plea. Thus, petitioner cannot establish that he would have chose to proceed to trial if the
issue of Wright's credibility had been handled differently.

That petitioner's counsel advised him to plead guilty, despite Wright's lie at the first
proffer, does not establish that petitioner's attorney was ineffective. As noted in the

---

[8]     A copy of the reports of Wright's two proffers, together with the United States'
cover letter which disclosed these proffers, is attached as "Exhibit E."

13

preceding subsection, petitioner was arrested immediately after the robbery, as he ran from the get-away vehicle and pointed a gun at the deputies.  In light of this evidence, it is extremely doubtful that the lie told by Wright about when the planning for the robbery began would have caused the jury to disbelieve Wright's testimony and conclude that petitioner was not involved in the robbery.

Further, petitioner has failed to inform the court about his own serious credibility problems.  First, if defendant had chosen to testify, he would have likely been exposed to impeachment with his prior felony conviction in 2001 for bank robbery.  *See* Fed. R. Evid. 609(a)(1).  In addition, regardless of whether defendant testified, the United States would have admitted the nonsensical statement that petitioner gave to law enforcement officers on the night he was arrested.[9]  During this interview, petitioner stated that: (1) the only reason he was with Wright that day was that Wright was giving him a ride to Earlville; (2) petitioner did not know of Wright's intent to rob the State Bank of Paw Paw until he saw Wright coming out of the bank with the money; (3) once they got back inside the car, Wright forced petitioner to place the money from the bank into petitioner's pockets; (4) while they were fleeing, petitioner tried to stop the car by grabbing the steering wheel and steering over the police "spike" sticks; (5) once Wright stopped the vehicle, Wright forced petitioner to run from the police; (6) as they were running, Wright fell and dropped the gun and petitioner

---

[9]    A copy of the FBI's report of the interview of petitioner is attached as "Exhibit F."

14

picked the gun up; and (7) after he picked up the gun, petitioner turned around to show the police the gun and yelled to them: "I have his gun!"

Based upon the facts cited above, counsel's advice that petitioner should plead guilty did not fall below an objective standard of reasonableness. Instead, this advice reflects an appropriate strategic decision designed to reduce, as much as possible, the term of petitioner's inevitable incarceration.

     B.     Petitioner's Post-Plea Hearing Claims

The remaining allegations in petitioner's motion relate to his counsel's performance at the sentencing stage of the proceedings. As noted in the "Procedural History" section of this response, petitioner waived his right to file a § 2255 motion. Because petitioner has not established that his § 2255 waiver was the result of involuntariness or ineffective assistance of counsel, petitioner's § 2255 waiver must be enforced and his challenges to his sentence dismissed.

As a general rule, waivers of the right to file § 2255 motions are enforceable. *Jones v. United States,* 167 F.3d 1142, 1145 (7th Cir. 1999). "A plea agreement that also waives the right to file a § 2255 motion is generally enforceable unless the waiver was involuntary or counsel was ineffective in negotiating the agreement." *Bridgeman v. United States,* 229 F.3d 589, 591 (7th Cir. 2000)(*citing Mason v. United States,* 211 F.3d 1065, 1069 (7th Cir. 2000)). "[I]t is *only* in these situations that a waiver is unenforceable." *Mason,* 211 F.3d at 1069 (emphasis in original).

15

In the present case, petitioner has not established that his § 2255 waiver resulted from ineffective assistance of counsel.  All of petitioner's pre-plea hearing claims of ineffective assistance have been discussed in the preceding sections of this response.  As previously explained, petitioner has not established that his counsel's performance was substandard with regard to any of his claims.  Thus, petitioner's § 2255 waiver was not caused by ineffective assistance of counsel.

In addition, petitioner has not established that his § 2255 waiver was involuntary.  To the contrary, the transcript of the plea hearing clearly establishes that the waiver was, in fact, voluntary.  During the plea colloquy, this court expressly addressed petitioner regarding the appellate/§ 2255 waiver:

| THE COURT: | It also says here that whatever sentence I impose, you're going to be giving up any right you have to appeal that sentence or to challenge it in any way later on; do you understand that? |
|---|---|
| DEFENDANT FRUIT: | Yes. |
| THE COURT: | Now, your lawyer has probably explained to you, and it's in the agreement, that there are a couple of exceptions to that rule which would allow you to challenge a sentence.  I will tell you now that those exceptions are very rare, so for all practical purposes, you are giving up any right you have to |

16

appeal a challenge at sentence; do you understand

this?

DEFENDANT FRUIT:    Yes.

P.Tr. 12. Immediately after this exchange, the court engaged in the following discourse with

petitioner:

THE COURT:    Has anyone forced you in any way to plead

guilty?

DEFENDANT FRUIT:    No.

THE COURT:    Has anyone threatened you in any way to cause

you to plead guilty?

DEFENDANT FRUIT:    No.

THE COURT:    Apart from the plea agreement, have any promises

been made to cause you to plead guilty?

DEFENDANT FRUIT:    No.

THE COURT:    Is your decision to plead guilty entirely voluntary?

DEFENDANT FRUIT:    Yes.

P.Tr. 12-13. As these exchanges clearly demonstrate, petitioner's waiver of his right to file

a § 2255 motion was completely voluntary.

Even if petitioner had not waived his right to file a § 2255 motion, all of his claims

relating to his sentencing still would have to be denied. Specifically, petitioner has not

established that his counsel's performance fell below an objective standard of reasonableness with respect to any of these sentencing claims.

        1.        Pre-Sentence Investigation Report

Petitioner's fifth, sixth, and seventh claims relate to the Pre-Sentence Investigation Report ("PSR"). Specifically, petitioner claims: (1) at the meeting with the Probation Officer, petitioner's attorney stated that he did not have any knowledge about the case; (2) a representative of the Federal Defender's office instructed petitioner not to independently contact the Probation Officer; and (3) the PSR was inaccurate. Petitioner has not established ineffective assistance with respect to any of these claims.

With regard to petitioner's claim about the meeting, Mr. Omar has denied telling the Probation Officer that he knew nothing about the case. Even assuming that Mr. Omar made this comment, petitioner has not established how this comment had any effect on the sentence petitioner received.

Assuming that the Federal Defender's office advised petitioner to avoid having independent contact with the Probation Officer, such advice does not constitute ineffective assistance. To the contrary, such an instruction constitutes sound legal advice. If a defendant attempts to minimize his criminal conduct while speaking with probation, such a comment can result in a defendant losing his acceptance of responsibility reduction. *See e.g., United States v. Travis,* 294 F.3d 837, 840 (7th Cir. 2002).

Finally, although petitioner claims that the PSR "was not accurate in many areas," he does not bother to specify what the inaccuracies were or how they affected his sentence. As

the Seventh Circuit as stated: "An ineffective assistance of counsel claim cannot stand on a blank record, peppered with the defendant's own unsupported allegations of misconduct." *United States v. Hodges,* 259 F.3d 655, 660 (7th Cir. 2001).

      2.     Low-end Prediction

Petitioner's eighth claim of ineffective assistance is that his attorney inaccurately predicted that petitioner would receive a sentence at the low-end of the applicable Sentencing Guidelines range. Contrary to petitioner's assertion, an inaccurate sentencing prediction by defense counsel does not constitute ineffective assistance.

In *United States v. Martinez,* 169 F.3d 1049, 1053 (7th Cir. 1999), the Seventh Circuit stated: "A defense attorney cannot promise his client a particular sentence; all he can do is make a prediction. . . . In this circuit, an attorney's 'mere inaccurate prediction of a sentence' does not demonstrate the deficiency component of an ineffective assistance of counsel claim." *Id.* (*quoting United States v. Barnes,* 83 F.3d 934, 940 (7th Cir. 1996)).

In addition, petitioner has not demonstrated that he was prejudiced by any inaccurate prediction by Mr. Omar.[10] According to petitioner's motion, Mr. Omar made this sentencing prediction on the day of the sentencing hearing. Thus, Mr. Omar's prediction could not have influenced defendant's decision to plead guilty.

Finally, as the defendant acknowledged under oath at the plea hearing, he was fully aware that the court could impose any sentence up to the statutory maximum of 20 years.

---

[10]     Mr. Omar has denied that he made any such prediction to petitioner.

P.Tr. 11.  Thus, even if Mr. Omar inaccurately predicted that this court would likely sentence petitioner at the low end of the Guidelines range, defendant was in no way prejudiced by this prediction.

### 3. Upper End Sentence

Petitioner next claims that his counsel was ineffective because petitioner received a sentence at the upper end of the applicable Sentencing Guidelines range.  Petitioner claims that if counsel had presented evidence at the sentencing hearing, the sentence would have been lower.  Once again, however, petitioner has failed to support this allegation.  Petitioner has not identified what evidence counsel should have presented or how this evidence would have resulted in a lower sentence.  Because petitioner has not provided any support for his allegation, defendant's ineffective assistance claim based upon his upper end sentence must be denied.

### 4. Sentencing Memorandum

Petitioner next claims that his attorney was ineffective because he did not file a "Sentencing Memorandum."  Petitioner does not specify what he means by "Sentencing Memorandum."  If he is referring to an objection to the PSR's Guidelines calculations, petitioner's claim is clearly contradicted by the record.

On November 28, 2007, Mr. Omar filed an objection to the PSR on behalf of petitioner.  R.35.  Specifically, Mr. Omar objected to the PSR's inclusion of a two-level "vulnerable victim" enhancement based upon the State Bank of Paw Paw's status as a rural bank.  *Id.*  Mr. Omar prevailed on this objection at the sentencing hearing.  S.Tr. 2-6.

20

Contrary to petitioner's assertion, the record reveals that Mr. Omar filed an appropriate objection to the PSR and successfully argued in favor of that objection. Petitioner's claim that Mr. Omar was ineffective for failing to file a "Sentencing Memorandum" has no merit.

5.    Downward Departures

Finally, defendant argues that his counsel was ineffective for failing to file any motions for downward departure. Once again, petitioner's claim has no merit.

In *United States v. Cruz-Velasco,* 224 F.3d 654, 663 (7th Cir. 2000), defendant Trevino argued that his counsel was ineffective for failing to move for downward departures based upon Trevino's age, family circumstances, and situation as an illegal alien. The Seventh Circuit rejected Trevino's claim, stating: "Absent a showing that trial counsel chose not to ask for an obviously applicable departure without any justification for his actions, we cannot conclude that his performance was objectively unreasonable." *Id.* at 664. *See also United States v. Bradford,* 78 F.3d 1216, 1225 (7th Cir. 1996)(holding that counsel was not ineffective for failing to move for a downward departure on the grounds that the criminal history category overstated the seriousness of defendant's past record, where defendant had a serious, violent criminal history).

In the present case, petitioner has not cited any facts or legal grounds which would have justified a downward departure. In addition, a review of the record and the applicable legal standards reveals no basis for a downward departure.

The bases for favored downward departures are set forth in Part K of chapter 5 of the Sentencing Guidelines. A quick examination of Part K reveals that none of these departure guidelines were applicable. For example, there was no evidence of wrongful conduct by the victim tellers that would support a downward departure under § 5K2.10. Furthermore, there was no evidence that defendant committed the bank robbery because of coercion or duress (§ 5K2.12) or because of diminished mental capacity (§ 5K2.13). In addition, defendant did not voluntarily disclose his offense (§ 5K2.16). Also, because petitioner had just gotten out of federal prison for robbing the same bank, his attorney could not rationally argue for an aberrant behavior departure (§ 5K2.20).

Similarly, none of the sentencing factors of 18 U.S.C. § 3553 would have supported a downward variance from the Guidelines range. The offense committed by petitioner was a serious, violent felony. Defendant's prior criminal record, which included a conviction for robbing the same bank, demonstrated a strong need for a sentence that would promote respect for the law, afford adequate deterrence, and protect the public from further crimes of the defendant. Based upon defendant's prior criminal record, it would have been irrational for defense counsel to move for a downward variance.

## IV.  CONCLUSION

For the reasons stated above, the United States respectfully requests that this court deny[11] petitioner's motion pursuant to 28 U.S.C. § 2255.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


BY:   s/Scott A. Verseman
SCOTT A. VERSEMAN
Assistant United States Attorney
308 West State Street - Rm. 300
Rockford, Illinois   61101
(815) 987-4444

---

[11]    Petitioner has not requested a hearing on his § 2255 motion.  Even if he had, a hearing would not be required, based upon the vague, conclusory, and incredible claims made by petitioner in his motion.  *See Ebbole v. United States,* 8 F.3d 530, 534 (7th Cir. 1993)(stating "a district court may deny a section 2255 motion without a hearing 'if the allegations in the motion are unreasonably vague, conclusory, or incredible, or if the factual matters raised by the motion may be resolved on the record before the district court" (*quoting Oliver v. United States,* 961 F.2d 1339, 1343, n.5 (7th Cir. 1992)).

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I, SCOTT A. VERSEMAN, certify that on May 19, 2008, I caused the foregoing "United States' Response in Opposition to Petitioner's Motion Pursuant to 28 U.S.C. § 2255":  (1) to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Western Division; and (2) a copy thereof to be mailed by first-class mail to:

> Jacob A. Fruit
> Registration No. 12262-424
> U.S.P. – McCreary
> P.O. Box 3000
> Pine Knot, Kentucky  42635

> s/Scott A. Verseman
> SCOTT A. VERSEMAN
> Assistant United States Attorney
> 308 West State Street - Room 300
> Rockford, Illinois 61101
> 815-987-4444

**EXHIBIT A**

09:53AM

1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3   UNITED STATES OF AMERICA,   )
                                )    No.  07 CR 50001
4             Government,        )
                                )
5   Vs.                         )    Chicago, Illinois
                                )
6   JACOB A. FRUIT,             )    September 5, 2007
                                )
7             Defendant.        )    9:53 o'clock a.m.

8
                    TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE JAMES B. ZAGEL
                       CHANGE OF PLEA
10

11  For the Government:

12          THE HONORABLE PATRICK J. FITZGERALD,
            UNITED STATES ATTORNEY
13          BY: Scott A. Verseman
            308 West State Street
14          Suite 300
            Rockford, Illinois   61101
15

16  For the Defendant:
            FEDERAL DEFENDER PROGRAM
17          BY:  Paul Flynn
            55 East Monroe Street, Suite 2800
18          Chicago, Illinois  60603

19

20  Court Reporter:

21                  Blanca I. Lara, CSR, RPR
                    219 South Dearborn Street
22                       Room 2504
                    Chicago, Illinois 60604
23                    (312) 435-5895

24

25
            THE CLERK:   2007 CR 50001, United States versus Jacob

| | | |
|---|---|---|
| 09:53AM | 1 | THE CLERK:  2007 CR 50001, United States versus Jacob |
| 09:53AM | 2 | Fruit. |
| 09:53AM | 3 | MR. VERSEMAN:  Good morning, your Honor. |
| 09:53AM | 4 | Scott Verseman for the United States. |
| 09:53AM | 5 | MR. FLYNN:  Good morning, your Honor. |
| 09:53AM | 6 | Paul Flynn on behalf of Jacob Fruit who also appears |
| 09:53AM | 7 | before your Honor. |
| 09:53AM | 8 | THE COURT:  We're here for a change of plea? |
| 09:53AM | 9 | MR. FLYNN:  That's correct. |
| 09:53AM | 10 | THE COURT:  Who arraigned him? |
| 09:53AM | 11 | MR. VERSEMAN:  I think he was arraigned in front of |
| 09:53AM | 12 | Judge Mahoney in Rockford. |
| 53AM | 13 | THE COURT:  Judge Mahoney; that's fine. |
| 09:53AM | 14 | Mr. Fruit, move to the center, its a little easier to |
| 09:53AM | 15 | talk from there. |
| 09:53AM | 16 | I understand it's your intention to offer a plea of |
| 09:53AM | 17 | guilty.  Before I can accept your plea of guilty, I've got to |
| 09:53AM | 18 | determine that you're mentally competent to plea at this time, |
| 09:54AM | 19 | that you've had the assistance of a lawyer, that you |
| 09:54AM | 20 | understand your trial rights, that you understand the charge |
| 09:54AM | 21 | against you, if your plea is voluntary, and there's a basis in |
| 09:54AM | 22 | fact for your plea. |
| 09:54AM | 23 | The way I do these things is, I put you under oath |
| 09:54AM | 24 | and I ask you some questions.  I want you to understand that |
| 54AM | 25 | while I'm asking you the questions, you can speak with your |

| | |
|---|---|
| 09:54AM | 1 |
| 09:54AM | 2 |
| 09:54AM | 3 |
| 09:54AM | 4 |
| 09:54AM | 5 |
| 09:54AM | 6 |
| 09:54AM | 7 |
| 09:54AM | 8 |
| 09:54AM | 9 |
| 09:54AM | 10 |
| 09:54AM | 11 |
| 09:55AM | 12 |
| 55AM | 13 |
| 09:55AM | 14 |
| 09:55AM | 15 |
| 09:55AM | 16 |
| 09:55AM | 17 |
| 09:55AM | 18 |
| 09:55AM | 19 |
| 09:55AM | 20 |
| 09:55AM | 21 |
| 09:55AM | 22 |
| 09:55AM | 23 |
| 09:55AM | 24 |
| 55AM | 25 |

lawyer at any time.  If you want me to interrupt the proceedings, I'd be happy to do that so you can speak with your lawyer.

It's very important that you tell me the truth.  If you give false answers to any of my questions, you can subject yourself to prosecution for perjury, it would be a new and separate crime.

Finally, in giving truthful answers to some of my questions, you're going to be giving up a constitutional right that you have.  You have the right not to admit anything at all, simply remain throughout all of these proceedings.  Obviously, if you plead guilty, you are going to admit you committed a crime.  So by going ahead with this procedure, you are going to give up a constitutional right that you have.  Do you understand what I've just told you?

DEFENDANT FRUIT:  Yes.

THE COURT:  Swear the defendant, please.

THE CLERK:  Would you raise your right hand, sir.

(Defendant duly sworn.)

THE COURT:  You can put your hand down.

Would you state your name for the record, please.

DEFENDANT FRUIT:  Jacob A. Fruit.


THE COURT:  How old, are you?

DEFENDANT FRUIT:  25.

| 09:55AM | 1 | THE COURT:  Where do you when you're not in custody? |
| 09:55AM | 2 | DEFENDANT FRUIT:  Rockford, Illinois. |
| 09:55AM | 3 | THE COURT:  Are you married? |
| 09:55AM | 4 | DEFENDANT FRUIT:  No. |
| 09:55AM | 5 | THE COURT:  How far did you go in school? |
| 09:55AM | 6 | DEFENDANT FRUIT:  High school graduate. |
| 09:55AM | 7 | THE COURT:  What kind of work have you done in the |
| 09:55AM | 8 | last 3 years? |
| 09:55AM | 9 | DEFENDANT FRUIT:  Contracting, cleaning. |
| 09:55AM | 10 | THE COURT:  Are you basically in good physical |
| 09:55AM | 11 | health? |
| 09:55AM | 12 | DEFENDANT FRUIT:  Yes.  Yes. |
| 09:55AM | 13 | THE COURT:  Have you had any kind of medication at |
| 09:56AM | 14 | all, any drug, any pill or any alcoholic drink in the last 24 |
| 09:56AM | 15 | hours? |
| 09:56AM | 16 | DEFENDANT FRUIT:  No. |
| 09:56AM | 17 | THE COURT:  Have you ever been under the care of a |
| 09:56AM | 18 | doctor or a hospital for a mental condition? |
| 09:56AM | 19 | DEFENDANT FRUIT:  No. |
| 09:56AM | 20 | THE COURT:  Counsel, do either of you have any doubt |
| 09:56AM | 21 | as to the defendant's competence to plead at this time? |
| 09:56AM | 22 | MR. VERSEMAN:  I do not, your Honor. |
| 09:56AM | 23 | MR. FLYNN:  No, your Honor. |
| 09:56AM | 24 | THE COURT:  I do find that you are competent to offer |
| 56AM | 25 | a plea of guilty. |

| 09:56AM | 1 | Can you tell me the name of the attorney that is |
| 09:56AM | 2 | representing you in this case? |
| 09:56AM | 3 | THE WITNESS:  Paul Flynn. |
| 09:56AM | 4 | THE COURT:  Have you had enough time to talk to Mr. |
| 09:56AM | 5 | Flynn? |
| 09:56AM | 6 | DEFENDANT FRUIT:  Yes. |
| 09:56AM | 7 | THE COURT:  Have you told Mr. Flynn everything you |
| 09:56AM | 8 | know about the case? |
| 09:56AM | 9 | DEFENDANT FRUIT:  Yes. |
| 09:56AM | 10 | THE COURT:  Are you satisfied with the advice and |
| 09:56AM | 11 | efforts on your behalf that were made by Mr. Flynn? |
| 09:56AM | 12 | DEFENDANT FRUIT:  Yes. |
| ^^:56AM | 13 | THE COURT:  The charge in your case is bank robbery. |
| 09:56AM | 14 | Have you seen the charge against you, the indictment against |
| 09:56AM | 15 | you? |
| 09:56AM | 16 | DEFENDANT FRUIT:  Yes. |
| 09:56AM | 17 | THE COURT:  And did you read it? |
| 09:56AM | 18 | DEFENDANT FRUIT:  Yes. |
| 09:56AM | 19 | THE COURT:  And did you discuss it with Mr. Flynn? |
| 09:57AM | 20 | DEFENDANT FRUIT:  Yes. |
| 09:57AM | 21 | THE COURT:  It says, basically, that the charge |
| 09:57AM | 22 | involves a situation in which you aided and abetted one Philip |
| 09:57AM | 23 | Wright in taking by intimidation from the person and presence |
| 09:57AM | 24 | of a bank employee $5,308 belonging to and in the care, |
| 57AM | 25 | custody, control, management and possession of State Bank of |

09:57AM  1  Paw Paw in Paw Paw, Illinois; do you understand that charge?

09:57AM  2        DEFENDANT FRUIT:  Yes.

09:57AM  3        THE COURT:  Basically, it says here that you helped

09:57AM  4  plan this robbery, that you went with Mr. Wright and that you

09:57AM  5  operated as a lookout when the robbery occurred; do you

09:57AM  6  understand that?

09:57AM  7        DEFENDANT FRUIT:  Yes.

09:57AM  8        THE COURT:  And do you understand that even though

09:57AM  9  you may not have actually gone into the bank, you are still

09:57AM  10  responsible for the bank robbery; as a whole; do you

09:57AM  11  understand that?

09:57AM  12        DEFENDANT FRUIT:  Yes.

09:57AM  13        THE COURT:  And you did, obviously, discuss with your

09:58AM  14  attorney this specific charge to which you intend to plead

09:58AM  15  guilty?

09:58AM  16        DEFENDANT FRUIT:  Yes.

09:58AM  17        THE COURT:  Under the constitution and laws of the

09:58AM  18  United States, you are entitled to a trial by jury on this

09:58AM  19  charge; do you understand that?

09:58AM  20        DEFENDANT FRUIT:  Yes.

09:58AM  21        THE COURT:  Are you retained or appointed, Mr. Flynn?

09:58AM  22        MR. FLYNN:  Appointed, your Honor.

09:58AM  23        THE COURT:  Mr. Flynn is, obviously, here assisting

10:46AM  24  you today, but if you chose to plead not guilty he would

46AM  25  provide assistance to you at trial, as well.  He's been

| | | |
|---|---|---|
| 10:46AM | 1 | appointed to serve as your counsel at trial if you wish to |
| 10:46AM | 2 | proceed to trial; do you understand this? |
| 09:58AM | 3 | THE WITNESS:  Yes. |
| 09:58AM | 4 | THE COURT:  You have a right to plead not guilty; do |
| 09:58AM | 5 | you understand this? |
| 09:58AM | 6 | DEFENDANT FRUIT:  Yes. |
| 09:58AM | 7 | THE COURT:  Did you say yes? |
| 09:58AM | 8 | DEFENDANT FRUIT:  Yes. |
| 09:58AM | 9 | THE COURT:  I didn't hear you.  I saw you nod, but I |
| 09:58AM | 10 | didn't hear you say yes. |
| 09:58AM | 11 | If you plead not guilty, you have a right to a speedy |
| 09:58AM | 12 | trial, at which time you would be able to see and hear all the |
| 09:58AM | 13 | witnesses called to testify against you; your lawyer will be |
| 09:59AM | 14 | able to cross-examine each and every one of those witnesses, |
| 09:59AM | 15 | and you could use the subpoena power of this court to bring |
| 09:59AM | 16 | witnesses here to testify on your behalf; do you understand |
| 09:59AM | 17 | this? |
| 09:59AM | 18 | DEFENDANT FRUIT:  Yes. |
| 09:59AM | 19 | THE COURT:  At trial, you'd be presumed to be |
| 09:59AM | 20 | innocent.  The government would be required to prove you |
| 09:59AM | 21 | guilty by competent evidence beyond a reasonable doubt before |
| 09:59AM | 22 | you could be found guilty; you would not have to prove that |
| 09:59AM | 23 | you were innocent.  Do you understand this? |
| 09:59AM | 24 | DEFENDANT FRUIT:  Yes. |
| 59AM | 25 | THE COURT:  Yes? |

| 09:59AM | 1 | DEFENDANT FRUIT:  Yes. |
| 09:59AM | 2 | THE COURT:  At trial, you'd have a right to testify, |
| 09:59AM | 3 | to get up on the witness stand and say that you were not |
| 09:59AM | 4 | guilty or simply tell your side of the story.  You also have a |
| 09:59AM | 5 | right to remain silent throughout the entire trial.  If you |
| 09:59AM | 6 | chose to remain silent, no inference or suggestion that you |
| 09:59AM | 7 | were guilty can be drawn from the fact that you did not |
| 09:59AM | 8 | testify; do understand this? |
| 09:59AM | 9 | DEFENDANT FRUIT:  Yes. |
| 09:59AM | 10 | THE COURT:  The trial could be either a jury trial or |
| 10:47AM | 11 | a trial by a judge without a jury.  You would not have a trial |
| 10:47AM | 12 | by a judge without a jury unless you personally agreed to this |
| 47AM | 13 | procedure; do you understand this? |
| 10:00AM | 14 | DEFENDANT FRUIT:  Yes. |
| 10:00AM | 15 | THE COURT:  If you had a jury trial, you would be |
| 10:47AM | 16 | tried by a jury of 12 persons.  Those persons would be |
| 10:47AM | 17 | selected from a larger group of individuals who come to court |
| 10:47AM | 18 | because their names are drawn at random from voters lists. |
| 10:47AM | 19 | You and your lawyer would have the right to exclude anybody |
| 10:47AM | 20 | from the jury which tried you if they were biased against you |
| 10:47AM | 21 | or otherwise disqualified.  You have the right to exclude a |
| 10:47AM | 22 | certain number of potential jurors simply because you did not |
| 10:47AM | 23 | want them to serve on your case.  Do you understand this? |
| 10:00AM | 24 | DEFENDANT FRUIT:  Yes. |
| 00AM | 25 | THE COURT:  If you had a jury trial, the jury would |

| 10:00AM | 1 | have to agree anonymously, all 12 would have to agree before |
| 10:00AM | 2 | they could reach any verdict, either guilty or not guilty; do |
| 10:00AM | 3 | you understand this? |
| 10:00AM | 4 | DEFENDANT FRUIT:  Yes. |
| 10:00AM | 5 | THE COURT:  At any trial, a judge or jury would be |
| 10:00AM | 6 | guided by the rule which requires that guilt be proved beyond |
| 10:00AM | 7 | a reasonable doubt; do you understand this? |
| 10:00AM | 8 | DEFENDANT FRUIT:  Yes. |
| 10:00AM | 9 | THE COURT:  If you went to trial and you were found |
| 10:00AM | 10 | guilty, you would have no right to appeal your conviction at |
| 10:00AM | 11 | sentence; do you understand this? |
| 10:00AM | 12 | DEFENDANT FRUIT:  Yes. |
| 00AM | 13 | THE COURT:  If you plead guilty, you waive, that is |
| 10:00AM | 14 | you give up every single one of these trial rights I just |
| 10:01AM | 15 | mentioned; do you understand this? |
| 10:01AM | 16 | DEFENDANT FRUIT:  Yes. |
| 10:01AM | 17 | THE COURT:  If you plead guilty and I accept your |
| 10:01AM | 18 | plea, there'll be no trial, I will enter a finding of guilty |
| 10:01AM | 19 | on the basis of your plea, and then sentence you after a |
| 10:01AM | 20 | sentence hearing; do you understand this? |
| 10:01AM | 21 | DEFENDANT FRUIT:  Yes. |
| 10:01AM | 22 | THE COURT:  I have in front of me a written plea |
| 10:01AM | 23 | agreement, I'm holding this up.  Have you seen this agreement? |
| 10:01AM | 24 | DEFENDANT FRUIT:  Yes. |
| 01AM | 25 | THE COURT:  Have you read it? |

10:01AM   1          DEFENDANT FRUIT:  Yes.

10:01AM   2          THE COURT:  And did you discuss it with your lawyer?

10:01AM   3          DEFENDANT FRUIT:  Yes.

10:01AM   4          THE COURT:  Have any agreements or promises been made

10:01AM   5   to you that are not contained in this writing?

10:01AM   6          DEFENDANT FRUIT:  No.

10:01AM   7          THE COURT:  After you read it and signed it and

10:01AM   8   discussed it with your attorney, did you sign it where I'm

10:01AM   9   pointing my finger?

10:01AM   10         DEFENDANT FRUIT:  Yes.

10:01AM   11         THE COURT:  I'm going to go over a couple of terms of

10:02AM   12   the agreement with you, but I do want to tell you, first of

10:02AM   13   all, that, under the law, the maximum sentence for this

10:02AM   14   offense is 20 years in prison, a maximum fine of $250,000, all

10:02AM   15   to be followed by a period of supervised release which must

10:02AM   16   last two years and could last as many as 3; do you understand

10:02AM   17   that's the maximum?

10:02AM   18         THE WITNESS:  Yes.

10:02AM   19         THE COURT:  In addition to that, I'm going to have to

10:02AM   20   order restitution in the amount that was taken; do you

10:02AM   21   understand?

10:02AM   22         DEFENDANT FRUIT:  Yes.

10:02AM   23         THE COURT:  In this case, the agreed amount of

10:02AM   24   restitution is $5,308; do you understand that?

10:02AM   25         DEFENDANT FRUIT:  Yes.

| | |
|---|---|
| 10:02AM | 1 |

THE COURT:  In addition to any sentence I impose upon you, I'm going to have to assess you $100; do you understand that?

DEFENDANT FRUIT:  Yes.

THE COURT:  Now, most sentences are not imposed at the maximum level, they're imposed with certain guidelines. You and your lawyer and the government have looked at the guidelines in this case and they believe the guideline to be 77 months at minimum and up to 96 months at the maximum.  Do you understand that's the probable guideline which will apply to your case?

DEFENDANT FRUIT:  Yes.

THE COURT:  It is possible that a mistake was made and the guideline might be a little higher or a little lower; do you understand that?

DEFENDANT FRUIT:  Yes.

THE COURT:  And, also, no matter what the guideline is, I am free, I can impose any sentence I choose.  That is to say, I could sentence you to 20 years in prison, 240 months, and I could sentence you to zero months; do you understand that that's entirely up to me?

DEFENDANT FRUIT:  Yes.

THE COURT:  Now, the government agrees that they are going to recommend a sentence within the applicable guideline range.  Do you understand that means that the government is

10:04AM 1   not going to ask me to go above the guideline range?

10:04AM 2          DEFENDANT FRUIT:  Yes.

10:04AM 3          THE COURT:  But do you also understand that I don't

10:04AM 4   have to follow the government's recommendation?

10:04AM 5          DEFENDANT FRUIT:  Yes.

10:04AM 6          THE COURT:  It also says here that whatever sentence

10:04AM 7   I impose, you're going to be giving up any right you have to

10:04AM 8   appeal that sentence or to challenge it in any way later on;

10:04AM 9   do you understand that?

10:04AM 10         DEFENDANT FRUIT:  Yes.

10:04AM 11         THE COURT:  Now, your lawyer has probably explained

10:04AM 12  to you, and it's in the agreement, that there are a couple of

10:04AM 13  exceptions to that rule which would allow you to challenge a

10:04AM 14  sentence.  I will tell you now that those exceptions are very

10:05AM 15  rare, so for all practical purposes, you are giving up any

10:05AM 16  right you have to appeal a challenge at sentence; do you

10:05AM 17  understand this?

10:05AM 18         DEFENDANT FRUIT:  Yes.

10:05AM 19         THE COURT:  Has anyone forced you in any way to plead

10:05AM 20  guilty?

10:05AM 21         DEFENDANT FRUIT:  No.

10:05AM 22         THE COURT:  Has anyone threatened you in way to cause

10:05AM 23  you to plead guilty?

10:05AM 24         DEFENDANT FRUIT:  No.

05AM 25            THE COURT:  Apart from the plea agreement, have any

| | | |
|---|---|---|
| 10:05AM | 1 | promises been made to cause you to plead guilty? |
| 10:05AM | 2 | DEFENDANT FRUIT:  No. |
| 10:05AM | 3 | THE COURT:  Is your decision to plead guilty entirely |
| 10:05AM | 4 | voluntary? |
| 10:05AM | 5 | DEFENDANT FRUIT:  Yes. |
| 10:05AM | 6 | THE COURT:  Again, do you understand that the final |
| 10:05AM | 7 | decision as to what your sentence will be rests with me? |
| 10:05AM | 8 | DEFENDANT FRUIT:  Yes. |
| 10:05AM | 9 | THE COURT:  Would the government please summarize |
| 10:05AM | 10 | what its evidence would be with respect to this charge if the |
| 10:05AM | 11 | case were tried. |
| 10:05AM | 12 | MR. VERSEMAN:  Yes, your Honor.  If this case were to |
| 10:05AM | 13 | go to trial, the government would prove the following facts |
| 10:05AM | 14 | beyond a reasonable doubt: |
| 10:05AM | 15 | That on January 5, 2007, the defendant aided and |
| 10:05AM | 16 | abetted codefendant Wright in taking by intimidation from the |
| 10:05AM | 17 | person and presence of a bank employee $5,308 belonging to and |
| 10:05AM | 18 | in the care, custody, control, management and possession of |
| 10:05AM | 19 | State Bank of Paw Paw, 235 Chicago Road, Paw Paw, Illinois, |
| 10:06AM | 20 | the deposits of which were then insured by the Federal Deposit |
| 10:06AM | 21 | Insurance Corporation. |
| 10:06AM | 22 | That prior to January 5.  2007, the defendant and |
| 10:06AM | 23 | Wright had discussed the fact that they both needed money. |
| 10:06AM | 24 | During the morning of January 5, 2007, defendant met with |
| 10:06AM | 25 | Wright at a house in Rockford, Illinois, where the defendant |

had been staying.

Defendant and Wight then discussed committing a bank robbery.  They agreed to rob the State Bank of Paw Paw in Paw Paw, Illinois.  Defendant told Wright that he knew the area around Paw Paw and that there would be no police officers in that area.

Defendant and Wright argued about which of them would be the one to enter the bank to commit the robbery, but they ultimately agreed Wright would go inside the bank.

Defendant also gave Wright instructions about how to commit the robbery.  Defendant then gathered certain items to be used in the robbery and placed them in a bag.  Defendant and Wright then got into Wright's red, 1992 Jeep Cherokee.

Wright drove his jeep, with the defendant as a passenger, from Rockford to Paw Paw, Illinois.  Prior to the robbery, defendant and wright stopped the vehicle and placed stolen license plate on the rear of the jeep.  The defendant as passenger from Rockford to Paw Paw, Illinois prior to the vehicle stopped the vehicle and placed a stolen license plate on the rear of the Jeep.

When they arrived at State Bank of Paw Paw, Wright parked the Jeep in the parking lot to the side of the bank. Both defendant and Wright got out of the Jeep and walked toward the front door of the bank.  Wright entered the bank, while defendant remained outside the front door as a lookout.

After Wright entered the bank, he walked toward a teller who was at her teller station. The teller asked if she could help Wright. Wright then demanded that the teller take all of the money out of her drawer and place it on the counter. The teller reached into her drawer, grabbed $5,308 that belonged to the bank, and provided it to Wright. Wright placed the money into a plastic bag. Wright then asked if there was any more money. The teller responded "no." She then showed Wright her coin tray and asked him if he wanted that. Wright responded that he did not want change. Wright walked away and left the bank.

After Wright left the bank, he and defendant then walked back to the Jeep and got inside. Then with Wright driving, they drove away from the bank.

A short distance from the bank, a Lee County Sheriff's deputy, driving a marked squad car, signaled for Wright to stop. Wright initially stopped the Jeep. After briefly discussing with defendant what they should do, however, Wright sped off.

Wright and defendant subsequently led Lee County and DeKalb County Sheriff's deputies on a high speed chase. During the course of this chase, defendant threw several items out of the window of the Jeep. Eventually, Wright pulled into a farm on the outskirts of Sycamore, Illinois. Defendant and Wright both jumped out of the Jeep and began to run towards

05:23PM   1   the woods.  After a short foot chase, defendant turned and

05:23PM   2   pointed a BB gun at a Lee County deputy.  The deputy fired his

05:23PM   3   service weapon at defendant, striking him in the ear.

05:23PM   4   Defendant was then taken into custody.

10:08AM   5          THE COURT:  Mr. Fruit, did you hear what the

10:08AM   6   prosecutor just said?

10:08AM   7          THE WITNESS:  Yes.

10:08AM   8          THE COURT:  Is what he said the truth?

10:08AM   9          DEFENDANT FRUIT:  Yes.

10:08AM   10          THE COURT:  Jacob fruit, what is your plea to this

10:08AM   11   charge?

10:08AM   12          DEFENDANT FRUIT:  Guilty.

··:08AM   13          THE COURT:  Since you acknowledge that you are in

11:01AM   14   fact guilty as charged, you've had the assistance of a lawyer,

11:01AM   15   you know what your trial rights are, you know what the maximum

11:01AM   16   possible punishment is and you are voluntarily pleading

11:01AM   17   guilty, I accept your plea of guilty and enter a judgment of

11:01AM   18   guilt on your plea.

11:01AM   19          I'm going to order a presentence investigation.

11:01AM   20   Your lawyer will explain the process to you.

11:01AM   21          There will be a report prepared about you.  You'll

11:01AM   22   have a chance to see that report before I do.  And if you

11:01AM   23   think there are mistakes in the report, you can bring them to

11:01AM   24   the attention of the probation officer or to my attention if

·01AM   25   you think it's necessary.

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 11:01AM  | 1  | At the sentencing hearing your lawyer will make                    |
| 11:01AM  | 2  | arguments on your behalf, the prosecutor will have her say as      |
| 11:01AM  | 3  | well.  The last thing I usually hear before I sentence is          |
| 11:02AM  | 4  | anything you want to say to me yourself.  I tell you this now       |
| 11:02AM  | 5  | so you can think about whatever it is you wish to say to me on      |
| 11:02AM  | 6  | that day.  If you choose not to speak on your own behalf, I         |
| 11:02AM  | 7  | will not hold it against you.                                      |
| 10:09AM  | 8  | The matter is continued for disposition at 2:00 p.m.               |
| 10:09AM  | 9  | on?                                                                |
| 10:10AM  | 10 | MR. VERSEMAN:  Judge, I would relate to the Court,                 |
| 10:10AM  | 11 | the probation officer in this case contacted me and requested      |
| 10:10AM  | 12 | a date sometime late November or early December based on her       |
| 10:10AM  | 13 | schedule.                                                          |
| 10:10AM  | 14 | THE COURT:  And the sentencing will be in Rockford?                |
| 10:10AM  | 15 | MR. VERSEMAN:  Rockford, your Honor.                               |
| 10:10AM  | 16 | THE COURT:  Yes.                                                   |
| 10:10AM  | 17 | So, Mr. Walker?                                                    |
| 10:10AM  | 18 | THE CLERK:  Wednesday, December 5th.                               |
| 10:10AM  | 19 | MR. FLYNN:  That's fine.                                           |
| 10:10AM  | 20 | MR. VERSEMAN:  That's fine with me, your Honor.                    |
| 10:10AM  | 21 | THE CLERK:  2:00 p.m.                                              |
|          | 22 | THE COURT:  Thanks, counsel.                                       |
|          | 23 |                                                                    |
|          | 24 | *      *      *      *      *      *      *      *                  |
|          | 25 |                                                                    |

18

1

2  I, BLANCA I. LARA, DO CERTIFY THAT THE FOREGOING IS A CORRECT

3          TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

4                    ABOVE-ENTITLED MATTER.

5

6

7

8

9

10      Blanca I. Lara                         Date

11

10:10AM
10:10AM  12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

09:53AM

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3    UNITED STATES OF AMERICA,    )
                                  )    No.  07 CR 50001
4             Government,         )
                                  )
5    Vs.                          )    Chicago, Illinois
                                  )
6    JACOB A. FRUIT,              )    December 5, 2007
                                  )
7             Defendant.          )    1:53 o'clock p.m.

8
                        TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE JAMES B. ZAGEL
                             SENTENCING
10

11   For the Government:

12             THE HONORABLE PATRICK J. FITZGERALD,
               UNITED STATES ATTORNEY
13             BY: Scott A. Verseman
               308 West State Street
14             Suite 300
               Rockford, Illinois   61101
15
     For the Defendant:
16             FEDERAL DEFENDER PROGRAM
               BY:  Haneef Omar
17             55 East Monroe Street, Suite 2800
               Chicago, Illinois  60603
18

19
     Court Reporter:
20
                        Blanca I. Lara, CSR, RPR
21                      219 South Dearborn Street
                            Room 2504
22                      Chicago, Illinois 60604
                            (312) 435-5895
23

24

56PM   25         THE CLERK:  2007 CR 50001, United States versus Jacob

| | | |
|---|---|---|
| 01:56PM | 1 | THE CLERK:  2007 CR 50001, United States versus Jacob |
| 01:56PM | 2 | Fruit. |
| 01:56PM | 3 | MR. VERSEMAN:  Good afternoon, your Honor. |
| 01:56PM | 4 | Scott Verseman for the United States. |
| 01:56PM | 5 | MR. OMAR:  Good morning, your Honor. |
| 09:53AM | 6 | Haneef Omar on behalf of Jacob Fruit who also appears |
| 01:56PM | 7 | before your Honor. |
| 01:56PM | 8 | THE PROBATION OFFICER:  Tori Powell from U.S. |
| 01:56PM | 9 | Probation. |
| 01:56PM | 10 | THE COURT:  I have in front of me a presentence |
| 01:56PM | 11 | investigation report.  Counsel, for the defense, I take it |
| 01:56PM | 12 | you've read this report? |
| ·56PM | 13 | MR. OMAR:  Yes, your Honor. |
| 01:56PM | 14 | THE COURT:  And you have discussed it with your |
| 01:56PM | 15 | client, as well? |
| 01:56PM | 16 | MR. OMAR:  I have. |
| 01:56PM | 17 | THE COURT:  Corrections, changes, objections? |
| 01:56PM | 18 | MR. OMAR:  I do have an objection to the presentence |
| 01:56PM | 19 | investigation, your Honor. |
| 01:56PM | 20 | THE COURT:  Beyond the written one? |
| 01:56PM | 21 | MR. OMAR:  No, your Honor. |
| 01:56PM | 22 | THE COURT:  Go ahead. |
| 01:57PM | 23 | Have you read it, as well. |
| 01:57PM | 24 | MR. VERSEMAN:  Yes, I have. |
| 57PM | 25 | THE COURT:  Corrections, changes? |

01:57PM 1        MR. VERSEMAN:  No corrections or changes.

01:57PM 2        THE COURT:  Proceed, counsel.

01:57PM 3        MR. OMAR:  Yes, your Honor.  We would object to the

01:57PM 4   two-point enhancement for vulnerable victim under 3A1.1(b)(1).

01:57PM 5   I believe the two points were added because the bank was in a

01:57PM 6   rural location.  As I pointed out in our written response, the

01:57PM 7   bank is not the victim, but the people, the tellers there.  As

01:57PM 8   the case law that I looked over also pointed out, it's the

01:57PM 9   bank tellers that have to have some unique characteristic

01:57PM 10  about them, separate and apart from all bank tellers that

01:57PM 11  would allow for the enhancement.

01:57PM 12       The two points are not appropriate in this case, your

·57PM 13  Honor, because we don't have enough information that shows

01:57PM 14  that the two victims were vulnerable, one; and two, that

01:57PM 15  Mr. Fruit knew they were vulnerable.  I believe an additional

01:57PM 16  case that's out there from, I believe, the Eleventh Circuit

01:58PM 17  cites to what the defendant thought or believed, and I believe

01:58PM 18  the statute, the sentencing guidelines calls for what the

01:58PM 19  defendant knew.

01:58PM 20       And we have a statement, that is not what the

01:58PM 21  defendant knew.  He doesn't have substantial knowledge of the

01:58PM 22  area, or the police patrol schedule, or the location of the

01:58PM 23  police at that instance.  And, in fact, he was wrong about the

01:58PM 24  presence of the police in the area at that time.  The police

58PM 25  responded very quickly and apprehended Mr. Fruit after a short

01:58PM    1    chase.  So Mr. Fruit did not have the knowledge that the bank

01:58PM    2    was, in fact, vulnerable because of the location of the bank

01:58PM    3    in a rural area.

01:58PM    4        So with that, your Honor, we would request that two

01:58PM    5    points not be added for as a vulnerable victim enhancement,

01:58PM    6    and Mr. Fruit's offense level be a 24 and his category 3 with

01:59PM    7    the guideline range of 63 to 78 months.

01:59PM    8        I would also point out that I believe, if my review

01:59PM    9    of the record is correct, Mr. Fruit's codefendant, Mr. Wright,

01:59PM   10    if I'm not incorrect, I don't believe the enhancement applied

01:59PM   11    in that case.

01:59PM   12        THE COURT:  I did decide the enhancement did not

01:59PM   13    apply in that case.

01:59PM   14        MR. VERSEMAN:  That is correct, your Honor.  As far

01:59PM   15    as the government's position, as we did in the codefendant's

01:59PM   16    case, the government takes no position with this issue.  While

01:59PM   17    we do note that the probation officer has support for her

01:59PM   18    decision in the Eleventh Circuit decision in Phillips, we're

01:59PM   19    not sure that the Eleventh Circuit's position is consistent

01:59PM   20    with the commentary in the application notes as MR. OMAR has

01:59PM   21    noted in his submission.  Note 2 of this particular 3A1.1

01:59PM   22    defines a vulnerable victim to be a person, and goes on to say

01:59PM   23    who is unusually vulnerable due to age, physical or mental

02:00PM   24    condition, due to age physical condition, et cetera.  Because

00PM   25    the definition uses the word "person," it mentions human

| | |
|---|---|
| 02:00PM | 1 |
| 02:00PM | 2 |
| 02:00PM | 3 |
| 02:00PM | 4 |
| 02:00PM | 5 |
| 02:00PM | 6 |
| 02:00PM | 7 |
| 02:00PM | 8 |
| 02:00PM | 9 |
| 02:01PM | 10 |
| 02:01PM | 11 |
| 02:01PM | 12 |
| 02:01PM | 13 |
| 02:01PM | 14 |
| 02:01PM | 15 |
| 02:01PM | 16 |
| 02:01PM | 17 |
| 02:01PM | 18 |
| 02:02PM | 19 |
| 02:02PM | 20 |
| 02:02PM | 21 |
| 02:02PM | 22 |
| 02:02PM | 23 |
| 02:02PM | 24 |
| 02PM | 25 |

characteristics.  I think it's difficult for me to argue an

institution such as a bank could be a vulnerable victim;

therefore, we take no position.

          THE COURT:  I previously ruled that the bank was not

a vulnerable victim, and I did so on a variety of grounds, one

having to do with the fact that they had private security in

addition to whatever local officials they had.  Also, it's an

area that is policed not merely by whatever police there are

in Paw Paw, but also by the sheriff and the State Police.

But, more importantly, as I thought with respect to the

defendant's case, the difficulty with applying any kind of

vulnerable victim in this situation is that the vast majority

of robberies of this sort, and in fact the vast majority of

robberies in general, are always conducted because the people

that are doing it think that there is something that weighs in

their favor when they do it: an easy escape path, no police

officer in sight.  It's a characteristic of most rational

attempts to rob banks and to rob stores.  I just assume that

there is some circumstances here which make this victim or

this target a suitable target; particularly, you can always

say that it's a vulnerable victim because they wouldn't have

done it if they didn't think that the victim was vulnerable.

          So even if it applied to institutions as well as

persons, I don't think vulnerable victim enhancement is

appropriate in this case.  It may very well be that Congress

| | | |
|---|---|---|
| 02:02PM | 1 | might take a different view, which they are entitled to do, |
| 02:02PM | 2 | but I don't think that they have done it, and I think the |
| 02:02PM | 3 | Eleventh Circuit and the courts of appeals that have talked |
| 02:02PM | 4 | about this and been inclined to treat it as vulnerable are |
| 02:03PM | 5 | just not within the ambit of the guidelines, leaving apart the |
| 02:03PM | 6 | occasional bank robber, that I see at least, and I think |
| 02:03PM | 7 | others have, who just want to be caught, but they're not too |
| 02:03PM | 8 | many of them.  So the appropriate guideline in this case would |
| 02:03PM | 9 | be 24/3. |
| 02:04PM | 10 | That's 63 to -- |
| 02:04PM | 11 | MR. VERSEMAN:  78. |
| 02:04PM | 12 | MR. OMAR:  78. |
| 02:04PM | 13 | THE COURT:  63 to 78. |
| 02:04PM | 14 | Now you can speak to the question of whether the |
| 02:04PM | 15 | guidelines are appropriate and where within the guideline |
| 02:04PM | 16 | range we should sentence.  We'll begin with the defense. |
| 02:04PM | 17 | MR. OMAR:  Yes, your Honor.  We feel that the |
| 02:04PM | 18 | guideline range is appropriate; however, the low end sentence |
| 02:04PM | 19 | of that guideline range is sufficient but not greater than |
| 02:04PM | 20 | necessary under the premise 3553A. |
| 02:04PM | 21 | If I may point out a little bit about Mr. Fruit's |
| 02:04PM | 22 | history and background.  Mr. Fruit has a criminal history |
| 02:04PM | 23 | category 3, he has a previous robbery of this same bank, as |
| 02:04PM | 24 | well. |
| 04PM | 25 | Mr. Fruit was 18 at the time, and a lot of his |

02:04PM  1   criminal history stems from going through a difficult period

02:04PM  2   of his life while he was a youth.  Just prior to that first

02:04PM  3   instance, he was informed that the father he had known his

02:05PM  4   whole life was not actually his biological father and his

02:05PM  5   mother would not have contact with him.  So for a young man

02:05PM  6   16, 17, 18 years old, he did not know how to cope with that,

02:05PM  7   so he found himself spending time with individuals that were

02:05PM  8   not healthy for him and he made a poor decision.

02:05PM  9       The first robbery was a spur of the moment kind of

02:05PM  10  thing where he found himself in a depressed state and hopeful

02:05PM  11  for money and he robbed the bank with a simple note he slid

02:05PM  12  across the desk, and he was given the money for that first

02:05PM  13  robbery.  And he served his time and he served his supervised

02:05PM  14  release after that.

02:05PM  15      This robbery came shortly after he was discharged

02:05PM  16  from his supervised release.  With this robbery, again

02:05PM  17  Mr. Fruit had trouble dealing with the difficult events in his

02:05PM  18  life, and this one he had joined a family.  He had taken care

02:06PM  19  of a woman and her two children and had treated them like his

02:06PM  20  own and she had left him for a very good friend of his.

02:06PM  21  Again, Mr. Fruit, a young man, he didn't deal with that in an

02:06PM  22  appropriate way and he stated, I believe, in the PSI, that he

02:06PM  23  didn't care about the consequence of his actions, and he found

02:06PM  24  himself again involved with the wrong crowd.

06PM  25        Mr. Wright and Mr. Fruit were traveling to Earlville

| 02:06PM | 1 | where Mr. Fruit is from, and having discussed Mr. Fruit's past |
|---|---|---|
| 02:06PM | 2 | and robbing the bank.  Again, Mr. Fruit's spur of the moment |
| 02:06PM | 3 | decision.  Mr. Fruit made the decision to stay outside and not |
| 02:06PM | 4 | participate robbing the bank from inside.  He was a passenger |
| 02:06PM | 5 | in the vehicle, he acted as a look-out, and when Mr. Wright |
| 02:06PM | 6 | emerged from the building, again they fled. |
| 02:07PM | 7 | And so Mr. Fruit is aware of the problems that lead |
| 02:07PM | 8 | him into criminal activity.  And he's notified the probation |
| 02:07PM | 9 | officer with respect to that he's aware now that he has |
| 02:07PM | 10 | difficulty dealing with his depression and the difficulties |
| 02:07PM | 11 | that come along with his life.  Now that he knows that and |
| 02:07PM | 12 | identifies when he's most vulnerable making a decision, he can |
| 07PM | 13 | address that ahead of time. |
| 02:07PM | 14 | His time in the Bureau of Prisons would be conducive |
| 02:07PM | 15 | in answering those problems, he can get treatment, drug |
| 02:07PM | 16 | counseling, a number of things that allow him to mature and |
| 02:07PM | 17 | deal with a number of issues that caused him to find himself |
| 02:07PM | 18 | in a situation where he is today.  Mr. Fruit would be close to |
| 02:07PM | 19 | 30 when he is out and will have matured in a way the Court |
| 02:07PM | 20 | will be assured he won't turn to criminal activity. |
| 02:08PM | 21 | With that, your Honor, there's a number of different |
| 02:08PM | 22 | factors regarding Mr. Fruit's life.  I know I skipped around a |
| 02:08PM | 23 | little bit regarding the 3553 factors regarding the nature and |
| 02:08PM | 24 | the offense, but considering Mr. Fruit's background and the |
| 08PM | 25 | events that occurred today, we feel the guideline range is |

| | |
|---|---|
| 02:08PM | 1 |
| 02:08PM | 2 |
| 02:08PM | 3 |
| 02:08PM | 4 |
| 02:08PM | 5 |
| 02:08PM | 6 |
| 02:09PM | 7 |
| 02:09PM | 8 |
| 02:09PM | 9 |
| 02:09PM | 10 |
| 02:09PM | 11 |
| 02:09PM | 12 |
| 09PM | 13 |
| 02:09PM | 14 |
| 02:09PM | 15 |
| 02:09PM | 16 |
| 02:09PM | 17 |
| 02:09PM | 18 |
| 02:09PM | 19 |
| 02:09PM | 20 |
| 02:09PM | 21 |
| 02:09PM | 22 |
| 02:09PM | 23 |
| 02:09PM | 24 |
| 10PM | 25 |

1  appropriate.  The Sentencing Commission has thought about and

2  discussed the aggravating factors that apply today, the

3  obstruction of justice that occurred here.  Mr. Fruit actually

4  lost partial hearing in his ear, applying the obstruction of

5  justice, we think, taking it out of the guideline range is not

6  appropriate, seeing he has already received two points for his

7  fleeing.  We feel that within the guideline range sentence is

8  an appropriate sentence and ask that Mr. Fruit be sentenced to

9  the low end of that guideline range.

10          THE COURT:  Mr. Verseman.

11          MR. VERSEMAN:  Yes, your Honor.  It's the

12  recommendation of the government that the Court sentence

13  Mr. Fruit at the upper end of the range, 63 to 78 month range.

14  We base our recommendation sentencing factors 18 U.S.C.

15  Section 3553, specifically the history and characteristics of

16  the defendant, the need for the sentence to reflect the

17  seriousness of the offense, and provide just punishment and

18  afford adequate deterrence and protect the public from further

19  crimes of this defendant.

20          The need for just punishment and need to protect the

21  public, I would point out that a bank robbery is a serious

22  offense, a violent crime, has the potential for someone to be

23  seriously hurt, if not killed.  And, in addition, this is a

24  crime that has a psychological effect on the victims, the bank

25  employees.  This is something that can have a lasting effect

02:10PM    1    on these people.

02:10PM    2            As far as the need for just punishment and the need

02:10PM    3    to protect the public, Mr. Omar has already mentioned it, but

02:10PM    4    this is a defendant who robbed the very same bank in December

02:10PM    5    of 2000 and then he turns around and robs again in January of

02:10PM    6    '07.  I've been a prosecutor for 17 years and I like to think

02:10PM    7    I know a little bit about motivation for particular crimes;

02:10PM    8    however, I'm simply at a loss to explain what the defendant's

02:10PM    9    motivation for robbing the same bank.  I would hope not some

02:10PM    10    sort of vindictiveness for this bank for cooperating in the

02:10PM    11    prosecution for the first time, but we just don't know.

02:10PM    12            Regardless of what the defendant's motivation is, I

02:10PM    13    think the employees of the State Bank of Paw Paw have a right

02:10PM    14    to expect that the gentleman who committed a violent crime

02:11PM    15    against them and their bank, twice in a span of 6 years, would

02:11PM    16    expect to receive a lengthy sentence.  I think that is needed

02:11PM    17    to protect the public from this individual, to protect these

02:11PM    18    bank employees from this individual, and to provide just

02:11PM    19    punishment for this man who has victimized these people twice

02:11PM    20    within a period of 6 years.

02:11PM    21            As far as the history and characteristics of the

02:11PM    22    defendant are concerns, it's our position that these also

02:11PM    23    warrant a sentence in the upper end of the range.  As I've

02:11PM    24    already mentioned, this is a second federal bank robbery

02:11PM    25    conviction.  This is a defendant who has previously been

02:11PM   1    before the same court, U.S. District Court for the Northern
02:11PM   2    District of Illinois, for the exact same offense.  Obviously,
02:11PM   3    he did not learn his lesson.  Obviously, he has not been
02:11PM   4    reformed and he is back in front of the same court for the
02:11PM   5    same offense.
02:11PM   6         Now, although the Court correctly found the criminal
02:11PM   7    history is 3, and as noted by Mr. Omar, the defendant did get
02:11PM   8    a benefit on the recent change in the guideline range;
02:12PM   9    otherwise, he would have been in criminal history 4, and that
02:12PM  10    range would have been increased 77 to 96 months.
02:12PM  11         I'd also like to point out to the Court the other
02:12PM  12    serious criminal conduct of this defendant.  Although no
02:12PM  13    convictions, he has been charged with other offenses and just
02:12PM  14    in a very short time span preceding the bank robbery he was
02:12PM  15    charged with here, and those charges are outlined in the
02:12PM  16    presentence report.  And particularly the ones that are
02:12PM  17    serious, in my view, are the October 30th, 2006, Ogle County
02:12PM  18    charge where criminal information was filed charging the
02:12PM  19    defendant with three counts of theft of postal money orders
02:12PM  20    that occurring August 24, 2006.  In addition, on October 31st
02:12PM  21    of '06, the very next day, in Winnebago County, the defendant
02:12PM  22    was charged with theft of computer and computer disk from a
02:12PM  23    business where he was doing janitorial work.  This defendant's
02:13PM  24    history is spiraling more and more toward criminal conduct.
13PM  25         Under the guidelines, the government could have filed

02:13PM    1    a motion upward for criminal history category which
02:13PM    2    under-represents the defendant's conduct and the likelihood of
02:13PM    3    additional offenses.  We're not making that motion here, but
02:13PM    4    my point is that I think this serious criminal conduct, and
02:13PM    5    the other criminal conduct that's out there, justifies a
02:13PM    6    sentence at the upper end of the range.
02:13PM    7         In addition, I would like to point to the nature and
02:13PM    8    circumstances of the offense.  The circumstances of this
02:13PM    9    offense when compared with the prior bank robbery, show a
02:13PM   10    defendant who is becoming more sophisticated and whose
02:13PM   11    criminal history conduct is becoming more dangerous.  I would
02:13PM   12    like to point out a couple of factors.
·13PM    13         The first robbery, the defendant conducted himself
02:13PM   14    and was passing a note; in the second, the defendant gets an
02:13PM   15    accomplice to work with him and serve as a lookout.  The first
02:13PM   16    robbery, the defendant was easily caught because he took off
02:14PM   17    from the scene in a car that had a personalized license plate
02:14PM   18    of Fruit 34.  Well, when we get to the second offense here,
02:14PM   19    the defendant brings with him another license plate and
02:14PM   20    changes the license plate of the vehicle he is riding in with
02:14PM   21    Mr. Wright prior to the bank.
02:14PM   22         This is a defendant showing more planning and taking
02:14PM   23    more steps to avoid detection.  We disagree with Mr. Omar when
02:14PM   24    he says it was a spur-of-the-moment offense as indicated by
14PM     25    Mr. Wright in his plea agreement.  This is something they

02:14PM    1    planned out at least in the morning of the robbery and took

02:14PM    2    with them the materials they would need when they got into the

02:14PM    3    vehicle to leave for Paw Paw.

02:14PM    4          In addition, one particular circumstance of the

02:14PM    5    offense warrants a sentence at the higher end of the range,

02:14PM    6    and that is that when the sheriff's deputies were in the

02:14PM    7    course of apprehended the defendant, the defendant pointed a

02:14PM    8    weapon at one of the police officers.  Thankfully, that was

02:14PM    9    just a BB gun, but what if instead of getting a BB gun that

02:15PM   10    day, the defendant had had access to a 9 millimeter or some

02:15PM   11    other type of pistol?

02:15PM   12          Now, I realize that the Court has already included an

·15PM     13    enhancement for brandishing a firearm, but I think the Court

02:15PM   14    should still take that into account in evaluating the

02:15PM   15    defendant's dangerousness and the need to protect the public

02:15PM   16    from further criminal conduct of this defendant.

02:15PM   17          In addition, the defendant's pointing of a weapon at

02:15PM   18    a police officer shows a willingness and propensity to engage

02:15PM   19    in violent criminal conduct beyond just the run-of-the-mill

02:15PM   20    bank robber who simply passes on a note.

02:15PM   21          For these reasons, your Honor, the government

02:15PM   22    requests and recommends the Court sentence this defendant at

02:15PM   23    the upper end of the guideline range.

02:16PM   24          THE COURT:  Do you have any brief response to that?

16PM      25          MR. OMAR:  I would only highlight, your Honor, the

02:16PM 1    guidelines do take into consideration much of the prosecutor's
02:16PM 2    arguments.  Mr. Fruit is already subject to enhancement for
02:16PM 3    obstruction of justice and for brandishing a firearm, as well.
02:16PM 4    His criminal history is reflected in the category 3.  Yes, it
02:16PM 5    did occur, but the Court should not consider that to
02:16PM 6    Mr. Fruit's detriment.  The law is what it is as of November
02:16PM 7    1, 2007.  Had the law changed for the worse, for more
02:16PM 8    punishment, Mr. Fruit would be subject to that punishment, as
02:16PM 9    well.  We just ask the Court to consider the low end of the
02:16PM 10   guideline range.  He has learned from his mistakes, he is
02:16PM 11   apologetic.
02:16PM 12          THE COURT:  Is there anything you would like to say
02:16PM 13   to me before I sentence you?
02:17PM 14          THE DEFENDANT:  No, your Honor.
02:17PM 15          THE COURT:  Can I ask you a question?
02:17PM 16          THE DEFENDANT:  Sure.
02:17PM 17          THE COURT:  Why did you send Wright into the bank?
02:17PM 18          THE DEFENDANT:  There is -- I really don't know.
02:17PM 19          THE COURT:  The guideline is appropriate for this.
02:17PM 20   I'm not going to go above or below the guideline in this case.
02:17PM 21   There are two things that bother me about this.  One of them
02:17PM 22   is not any particular fear of this particular defendant
02:17PM 23   deliberately perpetrating horrible crimes; he is not.
02:18PM 24          I don't like to use these two words together, but I
02:18PM 25   can't help it, he is not a skilled criminal.  But he presents

02:18PM    1    a danger that I saw in this case that may not be obvious to

02:18PM    2    anybody, because in some significant respects, the bank isn't

02:18PM    3    the only victim here. His codefendant is the other victim.

02:18PM    4    He sent Wright into the bank, which is ordinarily the more

02:18PM    5    dangerous thing to do. And while I don't give great weight to

02:18PM    6    -- particularly great weight to what Mr. Verseman says about

02:19PM    7    pointing the BB gun, my concern is, I think, at the time that

02:19PM    8    BB gun was pointed, Wright was already on the ground and in

02:19PM    9    custody.

02:19PM   10           MR. VERSEMAN: Yes, your Honor.

02:19PM   11           THE COURT: But the fact of the matter is, I'm quite

02:19PM   12    sure that if Wright and he were running together, he would

02:19PM   13    still have pointed the BB gun and not only have gotten himself

02:19PM   14    shot, he might have gotten Wright shot. So he endangered

02:19PM   15    Wright.

02:19PM   16           And so while the sentencing guidelines don't talk a

02:19PM   17    great deal to this and don't attach points to this, the fact

02:19PM   18    is is that your client was the leader of this small little

02:19PM   19    criminal enterprises, and he led it in such a way to endanger

02:20PM   20    his follower, and that counts against him, too. And for that

02:20PM   21    reason, I'm giving him the 78 months in the custody of the

02:20PM   22    Bureau of Prisons, to be followed by a period of 3 years of

02:20PM   23    supervised release. I'm imposing $400 fine to be paid to the

02:20PM   24    Inmate Financial Responsibility Program; $100 special

02:20PM   25    assessment. There is no restitution in this particular case.

02:20PM  1    The conditions of supervised release are that he participate

02:20PM  2    in a drug-after care at the direction of the Probation Office,

02:20PM  3    that he participate in mental health evaluation and

02:21PM  4    recommended treatment.  That he abide by all of the standard

02:21PM  5    conditions of supervised release by order of court.  That he

02:21PM  6    may not commit another criminal act under the law of any

02:21PM  7    jurisdiction, municipal, state or federal.  He may not, of

02:21PM  8    course, possess a firearm or explosive device.  If there is

02:21PM  9    any part of the fine that's not paid during the custodial

02:21PM  10   period, repayment becomes a condition of the supervised

02:21PM  11   release, and he must contribute 10 percent of his monthly

02:21PM  12   earnings as a minimum toward payment of the fine.

02:22PM  13        I designate the defendant to a comprehensive drug

02:22PM  14   treatment program.  Is that something which you concur?

02:22PM  15        MR. OMAR:  Yes.

02:22PM  16        THE DEFENDANT:  (Nodding.)

02:22PM  17        THE COURT:  I will make that recommendation.  Was

02:22PM  18   there a waiver of appeal?

02:22PM  19        MR. VERSEMAN:  Yes, your Honor.

02:22PM  20        THE COURT:  Anything further?

02:22PM  21        MR. OMAR:  Your Honor, we would request that the

02:22PM  22   Court make a recommendation for Lexington, Kentucky.

02:22PM  23        THE COURT:  Why Lexington?

02:22PM  24        MR. OMAR:  It's where Mr. Fruit was housed after his

22PM  25   previous robbery.  He is familiar with it.

02:22PM 1      THE COURT:  So it's not because it's near anybody,

02:22PM 2  right?

02:22PM 3      MR. OMAR:  No, your Honor.

02:22PM 4      THE COURT:  I'll recommend Lexington.

02:22PM 5      MR. OMAR:  Thank you.

02:22PM 6      THE COURT:  Anything further?

02:22PM 7      MR. VERSEMAN:  No, your Honor.

02:22PM 8      MR. OMAR:  No, your Honor.

02:22PM 9      THE COURT:  Thank you.

10          *     *     *     *     *     *     *     *

11

12

13  I, BLANCA I. LARA, DO CERTIFY THAT THE FOREGOING IS A CORRECT

14      TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

15          ABOVE-ENTITLED MATTER.

16

17

18

19

20  _____          5.208

21  Blanca I. Lara                          Date

02:24PM
02:24PM 22

23

24

25

**EXHIBIT C**

FD-395 (Rev. 2-28-97)

# ADVICE OF RIGHTS

Place _Dixon, IL_

Date _1-5-2007_

Time _9:35 p_

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _Jacob_

Witness: _Casimer J. Solena_

Witness: _Jim C. Peter_

Time: _9:37 P_

**EXHIBIT D**

## AFFIDAVIT

1.    I, HANEEF OMAR, am an attorney with the Federal Defender Program in the Northern District of Illinois, Western Division.

2.    Attorney Paul Flynn, formerly of the Federal Defender Program in the Northern District of Illinois, Western Division, was initially assigned to represent Jacob A. Fruit in the case of United States v. Jacob A. Fruit & Phillip G. Wright, 07 CR 50001.

3.    In April and May of 2007, I stood in for Mr. Flynn on behalf of Mr. Fruit at two status hearings before Magistrate Judge Mahoney. At both of these status hearings, at the direction of Mr. Flynn, I requested additional time for the filing of pre-trial motions on behalf of Mr. Fruit.

4.    In August and early September of 2007, Mr. Flynn negotiated a plea agreement with the United States on behalf of Mr. Fruit.

5.    In early September of 2007, I delivered a copy of the plea agreement to Mr. Fruit. I reviewed the contents of the plea agreement with Mr. Fruit. I also explained the change of plea process to Mr. Fruit and advised him of his rights. I further told Mr. Fruit that the ultimate decision regarding his sentence would be determined by the district judge. I did not tell Mr. Fruit that I was unaware of the facts of his case or that I could not assist him. I do recall discussing the facts of this case with Mr. Fruit. Prior to this meeting, I had become familiar with the facts of the case through conversations with Mr. Flynn and my own personal review of the file. I did inform Mr. Fruit that I could not comment on any advice he may have received from Mr. Flynn. I also informed Mr. Fruit that it was my opinion that

the plea agreement was an appropriate resolution, since the United States had agreed not to

pursue certain aggravating factors. For example, the United States had agreed not to argue

that Fruit should receive a leadership enhancement, pursuant to Guideline 3B1.1.

6.    Mr. Flynn represented Mr. Fruit at his plea hearing on September 5, 2007.

7.    I was present when the Probation Officer interviewed Mr. Fruit for purposes

of preparing the Pre-Sentence Investigation Report ("PSR"). I did not inform Mr. Fruit that

I could not assist him because of lack of knowledge about his case. I did inform Mr. Fruit

that he should direct any questions he had regarding the case to Mr. Flynn, since Mr. Flynn

was still the attorney assigned to represent him.

8.    I was informed that Mr. Fruit subsequently attempted to contact the Probation

Officer. I was also informed that the Investigator for the Federal Defender Program in the

Northern District of Illinois, Western Division, Brad Stallings, advised Mr. Fruit that any

contact with the Probation Officer in the absence of counsel would be ill-advised.

9.    In November of 2007, Mr. Flynn transferred from the Rockford office to the

Chicago office of the Federal Defender Program. After Mr. Flynn transferred, I was assigned

to represent Mr. Fruit.

10.    I reviewed the Pre-Sentence Investigation Report prepared for Mr. Fruit's case.

On November 28, 2007, I filed an objection to the PSR's proposed "vulnerable victim"

enhancement. On November 29, 2007, I sent Mr. Fruit a copy of the objection I filed on his

behalf. A copy of my cover letter to Mr. Fruit, dated November 29, 2007, is attached to this

affidavit. In my letter, I invited Mr. Fruit to call me if he had any questions. Despite my

invitation, Mr. Fruit did not contact me prior to his sentencing hearing.

11.     I represented Mr. Fruit at his sentencing hearing on December 5, 2007. Prior to this hearing, I did not apologize to Mr. Fruit for being unable to help him. In addition, I did not promise Mr. Fruit that he would receive a sentence at the low end of the Guidelines range: I have never made such a promise to any of my clients. I may have informed Mr. Fruit that, based upon information received from my colleagues in Chicago, Judge Zagel had a reputation for fairness. Mr. Fruit never asked me to move that the sentencing hearing be continued.

12.     At the sentencing hearing, I represented Mr. Fruit to the best of my ability. The court granted my objection to the PSR and refused to apply the "vulnerable victim" enhancement.

FURTHER AFFIANT SAYETH NAUGHT.

_____
HANEEF OMAR

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/16/08     _____
HANEEF OMAR

Jacob Fruit                                          November 29, 2007
Inmate                                              *Via hand delivery*
Ogle County Jail
PO Box 217
Oregon, IL 61061

Mr. Fruit;

    Attached please find a copy of the Presentence Investigation Report objections filed on your behalf in this case. I understand you spoke with Paul Flynn regarding a separate issue that is not to be including in the objections. As you may know, Paul Flynn is now in the Chicago office and I will be handling your sentencing. I will speak with you in much more detail before our sentencing hearing. If you have any questions at all please feel free to contact me at the above address and phone number.

Sincerely;

Haneef

**EXHIBIT E**



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*
*Western Division*

---

*Scott A. Verseman*                              *308 West State Street - Room 300*        PH:  (815) 987-4444
*Assistant U.S. Attorney*                        *Rockford, Illinois 61101*                 FAX : (815) 987-4236

March 15, 2007

**HAND DELIVERY**

Paul Flynn, Esq.
Federal Defender's Office
202 West State Street -- Suite 600
Rockford, Illinois 61101

      Re:    <u>United States v. Jacob A. Fruit,</u>
              07 CR 50001-01 (USDC ND IL WD)

Dear Mr. Flynn:

Enclosed is a CD containing additional discovery materials. These materials are stamped 000144 - 223.

As I discussed with Haneef Omar on March 13, 2007, the next status hearing for your client has been moved, from 11:00 a.m. on March 19th, to 9:00 a.m. on March 19th. If you have not already done so, please make a note of the new time for this status.

If you have not already done so, I ask that you to examine the possibility of a plea agreement with your client. As you know, any plea agreement must be reached sufficiently in advance of trial in order to permit review by the United States Attorney. We anticipate that we will begin our trial preparation in this case at least 3 weeks prior to trial. Therefore, I request that your client give the United States a firm commitment to plead guilty at least 3 weeks prior to trial and that any guilty plea be entered at least 2 weeks prior to trial. If you fail to comply with these deadlines, the United States will argue that your client is ineligible to receive an additional third level of reduction for acceptance of responsibility, pursuant to Guideline 3E1.1(b).

I will look forward to seeing you on Monday, March 19th, at 9:00 a.m.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:       *Scott Verseman*
                SCOTT A. VERSEMAN
                Assistant United States Attorney

Enclosure



**United States Attorney's Office**
Northern District of Illinois
219 S. Dearborn St., 5th Floor
Chicago, IL 60604
(312) 353-5300

This Medium Is
SENSITIVE
UNCLASSIFIED
(Limited Official Use Information)
U.S. Government Property
Protect it from
unauthorized disclosure

Case Name/Number:

Fruit

Contents:

000144-000223

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/12/2007

          PHILLIP G. WRIGHT, date of birth, July 1, 1986, was
interviewed, while in custody, at the Federal Courthouse Building,
Rockford, Illinois (IL).  WRIGHT, accompanied by his attorney, JOHN
NELSON, agreed to provide information to the Interviewing Agent and
Assistant United States Attorney (AUSA) SCOTT VERSEMAN, in the form
of a Proffer Interview.  At 10:20 a.m., the Interviewing Agent and
AUSA VERSEMAN joined WRIGHT and Attorney NELSON in the interview
room.  At that time, WRIGHT signed a Proffer Agreement Letter; the
original letter was retained by AUSA VERSEMAN.  WRIGHT provided the
following information:

          WRIGHT is from Rockford; he is twenty years old.  He was
educated at Ombudsman Educational Services.  WRIGHT received his
G.E.D. two years ago.  In regards to his most recent employment,
WRIGHT worked at a machine shop in Rockton, IL.  Prior to his
arrest, WRIGHT was living with his mother, DEBORAH OTTO.

          WRIGHT met JACOB FRUIT through a friend's girlfriend;
this was about two and a half months ago.  WRIGHT and FRUIT were
friends, not drug buddies.

          WRIGHT would often drive around in his Jeep.  FRUIT was
living with BRIAN RUGINSON (phonetic).  RUGINSON and FRUIT both
lived at RUGINSON's girlfriend's place in Rockford.  WRIGHT has
known RUGINSON for eleven years.

          WRIGHT and FRUIT did not have discussions about
committing a bank robbery prior to that day, January 5, 2007.  On
that day, WRIGHT woke up and took care of his heroin problem.
FRUIT told WRIGHT that he needed a ride to Earlville, IL in order
to help out his cousin with a car.  WRIGHT does not know if FRUIT
used drugs that day.

          For this ride, FRUIT gave WRIGHT ten to twenty dollars
for gasoline money.  They both got in WRIGHT's Jeep.  WRIGHT drove
to Route 20 and then turned onto Interstate 39, heading south.  He
did not drive to Earlville.  During the ride, WRIGHT and FRUIT
talked about their money problems.  FRUIT said that he had a kid on
the way and had to pay his rent.  WRIGHT told FRUIT that he owed
his mother some money.  FRUIT said that committing a bank robbery

---

Investigation on    01/24/2007    at    Rockford, IL

File #    91A-CG-126753                                      Date dictated    N/A

by    SA CASIMER J. SOLANA/cjs

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ___PHILLIP G. WRIGHT___ , On 01/24/2007 , Page __2__

would be an easy way to get money. FRUIT explained that a bank has to give you the money because it is their policy.

WRIGHT was pretty high on drugs during this conversation with FRUIT. WRIGHT owed money to his parents and his grandparents at the time of the bank robbery. Additionally, WRIGHT was on the waiting list for admission into the Gateway Center for drug rehabilitation; he needed money for that.

On the day of the bank robbery, WRIGHT and FRUIT were in the Jeep, near Paw Paw, IL, when they started talking about the bank robbery. They talked about who would go inside the bank and do the robbery. WRIGHT did not know that FRUIT had robbed that same bank years ago. He should have realized that FRUIT had done this before.

FRUIT instructed WRIGHT on how to rob the bank. FRUIT said that WRIGHT should tell the bank employee nicely to give him the money, without any force. FRUIT said that the bank will give WRIGHT the money. FRUIT instructed WRIGHT to tell the bank teller not to hit any alarms.

FRUIT also explained to WRIGHT why he (FRUIT) should not go inside the bank. FRUIT said that he used to live in the area of the bank. He did not want to go inside because he would have been recognized. At some point, WRIGHT told FRUIT, "Screw it, I'll be the one that goes in."

In regards to the b.b. gun that FRUIT had in his possession during the bank robbery, WRIGHT did not know anything about it. During the foot pursuit by the police, WRIGHT was wondering why there were shots being fired.

Prior to committing the bank robbery, FRUIT and WRIGHT pulled over the Jeep in order to switch the license plates. FRUIT supplied the license plate. Earlier that morning, when FRUIT entered the Jeep, he had a plastic grocery bag with him. There were several items inside the bag: hats, gloves, and the extra license plate. WRIGHT asked FRUIT for a hat. FRUIT gave him a stocking cap.

WRIGHT stopped the Jeep outside of Paw Paw, just off of Country Road. FRUIT said to WRIGHT, "We gotta change the plates so they don't trace us." FRUIT changed out the back license plate.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ____PHILLIP G. WRIGHT_____ , On 01/24/2007 , Page ___3___

       When WRIGHT and FRUIT talked about the bank robbery plan, they were near Paw Paw. FRUIT said, "I know there's a bank in Paw Paw." The gloves that WRIGHT had on came from the bag that FRUIT had with him. WRIGHT and FRUIT had no discussions about their getaway. Prior to entering the bank, WRIGHT told FRUIT, "If I go inside the bank, you need to stand by the front door."

       Before the bank robbery, WRIGHT and FRUIT drove through Paw Paw once. FRUIT then changed the license plate outside of town, on a country road. Following that, they drove back into town and then parked in the bank parking lot. WRIGHT left the engine running. WRIGHT put on the gloves while sitting in the Jeep, in the parking lot. WRIGHT had his hat on. FRUIT had his hat on and put on his gloves. They both got out of the Jeep and walked towards the bank. FRUIT was a couple of feet behind WRIGHT. FRUIT stopped at the entrance to the bank; WRIGHT went inside.

       WRIGHT walked up to a bank teller. He told her, "I need you to please empty your drawers. Don't press any alarms." The female bank teller offered him some change; he did not want it. WRIGHT removed a plastic bag from his hoodie pocket. He received the bag from FRUIT. The teller placed the money on the counter. She offered WRIGHT some change. He walked away from her and exited the bank.

       While inside the bank, WRIGHT observed some other people. During the robbery, FRUIT was at the front door, possibly on his cellular telephone. When WRIGHT walked out of the bank, he told FRUIT, "Let's go." They then both went to the Jeep. WRIGHT and FRUIT planned on going back to Rockford following the bank robbery.

       WRIGHT made a left turn out of the bank parking lot. He then made another left turn and eventually traveled on the road that the bank was on. WRIGHT handed the bag of money to FRUIT so that he could drive better. WRIGHT and FRUIT did not say anything to each other. FRUIT set the bag of money on the floorboard.

       WRIGHT saw the police car when he made a left turn at the stop sign, near the bank. WRIGHT turned left at the nearest road; he stopped the Jeep. FRUIT told WRIGHT, "You might as well go, we're already in trouble." At this point, the police officer was out of his car, standing by it. WRIGHT asked FRUIT what to do. WRIGHT started driving away. The police car was following them.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ____PHILLIP G. WRIGHT_____ , On 01/24/2007 , Page __4__

      FRUIT started to throw things out of the window.  The objects included WRIGHT's tools and boots.  WRIGHT believes that FRUIT did this in order to get the police to stop chasing them.

      WRIGHT did not see FRUIT do anything with the bank robbery money.  FRUIT handed him some and took the rest of it. During the vehicle pursuit, FRUIT told WRIGHT, "Find a wooded area so we could run into it."  FRUIT was telling WRIGHT which turns to make, "Turn here...turn there."

      WRIGHT ran over a spike strip; he saw it at the last second.  FRUIT knew that they had a flat tire.  FRUIT told WRIGHT to find a wooded area.  FRUIT was directing him.  FRUIT did not tell WRIGHT what to do after the Jeep was stopped.  Once near the farm, FRUIT said, "Pull in here."  WRIGHT and FRUIT jumped out of the Jeep and started running away.  WRIGHT jumped out of the Jeep while it was still moving.  He heard the Jeep crash into a tree while he was running.

      WRIGHT placed his bank robbery money in the pocket of his hoodie.  WRIGHT was tackled by a police flat officer.  WRIGHT had tripped over a vine.  He did not see where FRUIT went.  WRIGHT heard the gun shots that were fired; he did not observe them. WRIGHT was on the ground at the time of the gun shots.

      WRIGHT has had no contact with FRUIT since the last court date.

      The interview of WRIGHT ended.  He was remanded to the custody of the United States Marshals.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    03/13/2007

     PHILLIP G. WRIGHT, date of birth, July 1, 1986, was interviewed, while in custody, at the Federal Courthouse Building, Rockford, Illinois (IL).  WRIGHT, accompanied by his attorney, JOHN NELSON, agreed to provide information to the Interviewing Agent and Assistant United States Attorney (AUSA) SCOTT VERSEMAN, in the form of a Proffer Interview.  WRIGHT provided the following information:

     WRIGHT advised that he had not been truthful in his prior statements to the Interviewing Agent and AUSA VERSEMAN.  WRIGHT apologized to the interviewers for this.  He withheld information about the planning of the bank robbery with JACOB FRUIT.  WRIGHT believed that his prison sentence would have been harsher if his actions on the day of the bank robbery were considered to be premeditated.

     WRIGHT and FRUIT first started talking about committing a bank robbery on the morning of January 5, 2007.  At 7:00 or 8:00 a.m., that morning, they were both at FRUIT's place, talking about it.  FRUIT lived with his friends, BRIAN and PAM.  WRIGHT had been kicked out his mother's house.

     FRUIT was already there when WRIGHT arrived.  WRIGHT went over there to hang out and talk with FRUIT.  On the day before, WRIGHT and FRUIT had a conversation about how broke they were.  FRUIT said that he would think about how to get some money.  He said that he had some ways that he could get some.  FRUIT did not want to discuss it further over the telephone.  WRIGHT provided his cellular telephone number as, 988-5107.  WRIGHT believes that FRUIT's cellular telephone number is, 319-0838.

     On the day of the bank robbery, WRIGHT had used some heroin at the house, but not with FRUIT.  After WRIGHT shot up with some heroin, FRUIT came over and talked to him.  FRUIT said that a bank robbery would be a good way to get some money.  FRUIT talked about a bank in Paw Paw, IL.  He explained that the town and the bank were out of the way; there were no cops around.  FRUIT did not tell WRIGHT that he had robbed this same bank before.

     FRUIT brought the bank robbery clothes with him.  While WRIGHT sat on the couch, FRUIT went to his room and gathered gloves, hats, and everything else.  FRUIT placed all of the items

---

| | | | |
|---|---|---|---|
| Investigation on | 01/31/2007 | at | Rockford, IL |

File # 91A-CG-126753                           Date dictated   N/A

by     SA CASIMER J. SOLANA/cjs

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ___PHILLIP G. WRIGHT___ , On 01/31/2007 , Page ___2___

into a bag.  WRIGHT observed all of this from the living room.
WRIGHT did not observe FRUIT placing a gun into the bag.  No one
else was in the house with WRIGHT and FRUIT at this time.  WRIGHT
believes that FRUIT may have used BRIAN's b.b. gun for the bank
robbery.

    WRIGHT is pretty sure that FRUIT got the license plate
out of his car.  WRIGHT kept the old license plates for his Jeep
inside of it.  The Jeep used to belong to WRIGHT's immediate
family.  The license plates were sitting inside of a bag in the
car.

    FRUIT told WRIGHT that he did not need a gun for the bank
robbery.  He also told WRIGHT that he did not need to scream at
people during the robbery.  FRUIT told him that the bank tellers
are trained to give up the money; the bank is insured.

    WRIGHT did not know that FRUIT had served time in prison
for committing a bank robbery.  WRIGHT knew that FRUIT had been to
prison, but he thought it was for drugs.

    On the morning of the bank robbery, FRUIT and WRIGHT
discussed the plan for about one and a half hours.  No one else was
at the house.  They went over everything so that it would be clear.
They did not decide on who would go inside the bank.  WRIGHT
thought that both of them would go inside.  They also talked about
changing the license plate on the Jeep.  They decided that it
should be a different license plate when driving away from the
bank.

    Following this, WRIGHT and FRUIT drove to Paw Paw.
WRIGHT drove through the town once or twice.  They then went out of
town and changed the license plate on the Jeep.  FRUIT changed the
license plate.  WRIGHT is not sure if FRUIT wore gloves when he did
this.  FRUIT probably did not need a screwdriver to change the
license plate.  The screws that hold on the plate are pretty loose.

    The other license plate that was recovered inside of
WRIGHT's Jeep, belongs to his brother, NICK.  If not, it belongs to
his father, GREG.  WRIGHT got the Jeep in the summer.  He got a
temporary plate and this plate.  WRIGHT threw the old license plate
in his Jeep.  WRIGHT purchased the Jeep from his father legally.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ___PHILLIP G. WRIGHT_____ , On 01/31/2007 , Page ___3___

      WRIGHT had not provided some of this information in earlier interviews, because he thought that his actions on the day of the bank robbery would be considered premeditated.

      The interview of WRIGHT concluded.  He was remanded to the custody of the United States Marshals.

**EXHIBIT F**

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/31/2007

JACOB ALLEN FRUIT, date of birth, January 6, 1982, Social Security Account Number, 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, was interviewed, while in custody, at the Lee County Jail, Dixon, Illinois (IL). FRUIT was interviewed by Special Agent (SA) CASIMER J. SOLANA, SA GRAIG A. PETERSON, and Detective DAVID M. GLESSNER, Lee County Sheriff's Department. At approximately 9:30 p.m., FRUIT was brought into an interview room, joining the aforementioned interviewers. FRUIT was provided with the identities of each of the interviewers. SA SOLANA, observing that FRUIT had an apparent injury to his ear, asked him if he could hear. FRUIT advised that he could hear, and that he was willing to provide a statement to the interviewers regarding his arrest earlier in the day. FRUIT advised that he was administered some morphine at the hospital earlier today. At 9:35 p.m., SA SOLANA provided FRUIT with an FD-395, Advice of Rights Form. SA SOLANA read aloud, to FRUIT, each of the rights contained on the form. Upon being read his rights, FRUIT acknowledged that he understood each of them. At 9:37 p.m., FRUIT signed the FD-395 form; SA SOLANA and SA PETERSON signed the form as witnesses. The original FD-395 form will be maintained in a 1-A envelope in the file. FRUIT provided the following information:

The name of the person that FRUIT was with earlier today, when they were both arrested, is PHIL (WRIGHT). This morning, PHIL came by and picked up FRUIT. FRUIT wanted a ride to Earlville, IL. PHIL agreed to give FRUIT a ride to Earlville. With PHIL driving, FRUIT fell asleep during the ride. FRUIT's girlfriend is SARAH BROWN, age 20. They are expecting a child.

FRUIT has known PHIL for a couple of months. FRUIT asked PHIL for a ride today. He offered PHIL some money for gasoline. PHIL gave FRUIT some pills for his migraine headache.

Regarding today's incident at the STATE BANK OF PAW PAW, FRUIT provided the following information:

PHIL stopped at the bank; he went inside. A short time later, PHIL came out of the bank, carrying a bag of money and a gun. PHIL knows that FRUIT had been convicted of robbing a bank years ago.

---

Investigation on    01/05/2007    at   Dixon, IL

File #  91A-CG-126753                            Date dictated   N/A

        SA CASIMER J. SOLANA/cjs
by    SA GRAIG A. PETERSON

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of   JACOB A. FRUIT                              , On 01/05/2007 , Page   2

    After exiting the bank, PHIL proceeded to the bank parking lot and entered his Jeep; FRUIT got in also. PHIL started screaming. He drove his Jeep onto a gravel road and then in a big circle. FRUIT saw a police car on the side of the road. The police officer started to chase PHIL and FRUIT. Eventually, the police tried to stop PHIL's Jeep by placing a spike-strip on the road. During the police chase, PHIL told FRUIT to put on a ski-mask. FRUIT felt threatened by PHIL because PHIL was holding a gun when he ordered him to do this. Additionally, PHIL told FRUIT to place the money from the bank robbery into his (FRUIT's) pockets. PHIL also told FRUIT to start throwing objects out of the window.

    Once the Jeep came to a stop, PHIL told FRUIT to start running away from the cops. PHIL still had the gun in his hand when they both got out of the Jeep. PHIL was behind FRUIT when the two of them were running away from the police. FRUIT ran into some vines. PHIL fell down to the ground. FRUIT thought that this would be a good opportunity to get the gun away from PHIL. FRUIT believed that it would be better if he had control of the gun as opposed to PHIL having control of it. FRUIT picked up the gun and started running again. The police officer was right there. PHIL was knocked to the ground by the police officer. FRUIT only remembers bits and pieces of the incident.

    FRUIT continued running away from the police officer. As he was doing this, he wanted to let the police officer know that he had PHIL's gun. At this point in the interview, FRUIT demonstrated with his hand how he waved the gun above his head so that the chasing police officer could see it. FRUIT yelled out to the police officer, "I have his gun! I have his gun!" FRUIT did not know where the police officer was. In order to locate the officer, FRUIT turned his body towards the area behind him. FRUIT demonstrated this maneuver to the interviewers. The hand in which FRUIT was holding the gun, swung around his body. FRUIT heard some gunshots; something hit his head. FRUIT was taken into custody by the police officer.

    FRUIT was asked to provide additional details about the information he had provided during the interview; he provided the following information:

    FRUIT needed a ride to Earlville in order to fix his girlfriend's car. The car is a Dodge Stratus, possibly a 1998 model. FRUIT believes that there was a problem with the starter.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ___JACOB A. FRUIT_____, On _01/05/2007_, Page ___3___

His girlfriend lives in Cherry Valley, IL; her telephone number begins with 815-519 or 815-517.

During the trip to Earlville, FRUIT woke up and realized that he and PHIL were on the wrong side of Paw Paw. PHIL told FRUIT that he needed to stop at the bank and cash his check. PHIL parked his Jeep in the bank parking lot and got out of the vehicle. He messed with his papers. FRUIT, tired from the trip, got out of the vehicle so that he could smoke a cigarette. He also wanted to stretch his legs. FRUIT and PHIL did not walk together towards the bank. PHIL entered the bank. FRUIT sat down on a brick wall that was near the bank entrance. He sat there and smoked one half of a cigarette. Additionally, FRUIT used his cellular telephone to try to contact his girlfriend. He made a couple of telephone calls but did not get through to his girlfriend. FRUIT did not leave a message for her.

After PHIL exited the bank, he entered his Jeep. PHIL threw the bag of money on the floorboard directly in front of FRUIT. FRUIT looked down and could see that there was a lot of money inside of the bag. FRUIT asked PHIL if he could get out of the Jeep. PHIL told FRUIT, "You've done it before. Just stay in the car." PHIL offered FRUIT some money if he would just stick with him.

This morning, FRUIT was suffering from a migraine headache. PHIL gave him a few pills to make him feel better. FRUIT took four different pills; one was red and white. FRUIT did not know what the pills were; they could have been muscle relaxers. Once in a while, FRUIT takes a Vicodin pill; his discs in his neck are messed up.

During today's police pursuit, FRUIT grabbed the steering wheel from PHIL a couple of times. He did this because he wanted to help stop the vehicle for the police. FRUIT saw the spike-strip ahead on the road; he tried to swerve the car into the spike-strip.

FRUIT believes that PHIL robbed the bank because he needed money for drugs. FRUIT knows BRIAN, PAM's boyfriend.

Regarding the gun that PHIL had today, FRUIT has never seen it before. BRIAN does not have any real guns. The gun that PHIL had today was real; it was heavy. FRUIT reiterated that PHIL told him to stuff the bank robbery money into his pockets. He did this because PHIL was holding a gun at the time.

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ___JACOB A. FRUIT_____ , On _01/05/2007_ , Page ___4___

     When the police officer came up behind them, PHIL told
FRUIT that he was going to lose them.  During the foot pursuit,
PHIL told FRUIT to run in front of him.  It is possible that FRUIT
got out of the Jeep before PHIL did.  While they were running, PHIL
and FRUIT bumped into each other; they both fell down.  At that
point, FRUIT picked up PHIL's gun.

     In the past, FRUIT has told PHIL about his history with
that bank branch.  They have driven past it; FRUIT pointed it out
to PHIL.  FRUIT is trying to start a family; he has too much going
on.  In terms of employment, FRUIT is not working much right now.

     FRUIT denies that he pointed the gun at the police
officer today.  He was waving the gun over his head, yelling, "I
have his gun.  I have his gun."  FRUIT has no idea what kind of gun
it was.  He does not know how many bullets were inside of it.
FRUIT does not know what caliber the gun was.

     The police were behind FRUIT when he was running from the
Jeep.  He cannot explain why he kept running when the cops were
chasing him.

     During his transport to this jail tonight, FRUIT asked
the deputy, "They did catch old boy (PHIL), didn't they?"  The
police officer replied to FRUIT that he could not talk about it.
After arriving at this jail, FRUIT told the jail guards two or
three times, "Hey, it wasn't me."

     FRUIT's girlfriend knows that he was going to fix her car
the following day.  FRUIT acknowledged that he robbed the same bank
in December 2000.  He got out of prison about 3 ½ years ago.  FRUIT
got off federal probation in August 2006; his probation agent was
ERIC SEAGREN.

     At this point in the interview, SA SOLANA stated to FRUIT
that his statement regarding today's events was unbelievable and
untruthful.  FRUIT was provided with another opportunity to
describe the events that occurred today.  He advised that the
entire statement he provided to the interviewers consisted of the
truth.

     FRUIT added that PHIL looked startled when he exited the
bank and saw him standing there.  He believes that PHIL did not
know that FRUIT would be standing outside the bank.  FRUIT

FD-302a (Rev. 10-6-95)

91A-CG-126753

Continuation of FD-302 of ____JACOB A. FRUIT_____ , On 01/05/2007 , Page __5__

reiterated that PHIL pointed the gun at him during the police chase.

   The interview of FRUIT ended.

   At 11:40 p.m., SA SOLANA and Detective GLESSNER exited the interview room; SA PETERSON remained with FRUIT.  At 11:55 p.m., SA SOLANA entered the interview room with Detective WILLIAM KRONKE, Illinois State Police (ISP).  Detective KRONKE was accompanied by another ISP detective.  SA PETERSON exited the room. Detective KRONKE provided FRUIT with his identity.  FRUIT agreed to be interviewed by Detective KRONKE regarding his arrest and the injuries he sustained as a result of the arrest.  SA SOLANA observed as Detective KRONKE provided FRUIT with his Constitutional Rights.  FRUIT agreed to proceed with the interview.

   At 12:05 a.m., SA SOLANA exited the interview room.